## KERCHEVAL et al. v. ROSS et al.
### No. 10633.

District Court, E. D. Missouri, E. D.
Feb. 24, 1934.

Charles Claflin Allen, Jr., of St. Louis, Mo., for plaintiffs.

Sterling H. McCarty and Von Mayes, both of Caruthersville, Mo., for defendants.

FARIS, District Judge.

Plaintiffs bring in equity a class suit for themselves and all others who are similarly interested and situated, to enjoin defendants, including defendant Ross, who is collector of the revenue of Pemiscot county, Mo., from accepting in payment of drainage taxes, past-due bonds and coupons of defendant drainage district No. 8, in Pemiscot county.

The defendant drainage district was organized, about 1912, under the provisions of article 4 of chapter 41 (section 5578 et seq.), Revised Statutes of Missouri of 1909, now article 2 of chapter 64 (§ 10809 et seq.), Revised Statutes of Missouri of 1929 (Mo. St. Ann. art. 2, c. 64, § 10809 et seq., p. 3532 et seq.), the same being the so-called County Court Drainage Act of Missouri, and, since, has been duly functioning as such drainage district, and promptly meeting its obligations, until the year of 1929, when it defaulted, and since it has been, and now is, wholly insolvent.

Beginning in May, 1912, defendant district issued and sold four several series of bonds bearing dates, respectively, May 1, 1912, March 1 and May 1, 1915, July 1, 1918,

and November 1, 1922, and amounting in the aggregate to the sum of $1,200,000, of which some $600,000 have been paid, and some $600,000 are yet outstanding and unpaid.

As forecast, the district made default in the payment of the bonds due May 1, 1929, and on both principal and interest of all bonds maturing thereafter.

Plaintiffs are the members of a bondholders' committee, and as such are the owners, holders, or bearers of $271,500 par value of the bonds of defendant drainage district, of which sum, when this action was begun, $62,500 had matured and were due and unpaid, and the balance had not then matured.

Defendant district has in its sinking fund only the sum of $71,159, while there are outstanding, due, and unpaid, bonds aggregating the sum of $181,400.

During the years 1932 and 1933, defendant Ross collected and accepted, and defendants county court and drainage district accepted, in payment of drainage taxes on the lands in the district, the sum of $58,460 in bonds and coupons of the district, and during the same period collected only the sum of $9,500 in money, or in that legal tender set out in section 11457, Revised Statutes of Missouri 1909, as amended by the Act of 1911 (section 12903, R. S. Mo. 1919), which was in force when all of the bonds issued by the district were so issued and sold.

When the bonds held by plaintiffs were issued and sold, the Missouri statute providing for the manner of payment, and the legal tender therefor, read thus: "Except as hereinafter provided, all state, county, township, city, town, village, school district, levee district and drainage district taxes shall be paid in gold or silver coin or legal tender notes of the United States, or in national bank notes." Laws of Missouri, 1911, p. 418.

There are exceptions to the above statute, but they have nothing to do with drainage districts. There was added to the above statute, by an amendment made in the year 1929 (Laws of Mo. 1929, p. 432 [Mo. St. Ann. § 9911, p. 7963]), an exception to the general requirement of the statute which did have to do with drainage districts, which reads as follows: "Past due bonds or coupons of any county, city, township, drainage district, levee district or school district shall be received in payment of any tax levied for the payment of bonds or coupons of the same issue, but not in payment of any tax levied for any other purpose." Section 9911, R. S. Mo. 1929 (Mo. St. Ann. § 9911, p. 7963).

Perforce the terms of the statute last quoted, defendants admit that they have accepted in payment of drainage taxes past-due bonds and coupons of defendant drainage district, and concede that they will continue to do so, unless restrained.

So, plaintiffs contend that, as to an insolvent drainage district, and as to them, as the owners, holders, and bearers of well-nigh one-half of the outstanding bonds of defendant district, the above statute passed in the year 1929 is unconstitutional, for that it is in violation of both section 10 of article 1 of the Federal Constitution, and of section 15 of article 2 of the Constitution of Missouri of 1875, which sections each forbid the state of Missouri from passing any law impairing the obligation of a contract.

Wherefore, plaintiffs sue here, because a federal question is involved, and pray that defendants may be enjoined from accepting past-due bonds and coupons of defendant drainage district of any given issue in payment of drainage taxes levied to pay such issue and interest thereon.

Defendants by their answer admit every allegation of fact pleaded by plaintiffs, except the fact that more than the sum of $3,000 is involved. They deny, as an issue of law (but, of course, not of fact), that, as to plaintiffs, the amendment of 1929 to section 9911, supra, and last above quoted, is constitutionally invalid. They set up as affirmative defenses, in effect: (a) That it is to plaintiffs' financial advantage to permit the drainage district bonds and coupons to be used in payment of drainage taxes, because a continuance of the fact is producing a market for these bonds and coupons, otherwise nonexistent, in which market these bonds and coupons are being sold, and will continue so to be, at 60 per cent. of their par value; and (b) that since plaintiffs are not the holders, owners, or bearers of all of the outstanding bonds and coupons of defendant district, they cannot maintain this action without the presence, as parties, of all the bondholders of the district, some of whom may desire to sell their bonds at a discount, and to be used in the payment of drainage taxes.

■ As said already, save as to the jurisdictional sum in dispute, all of the questions raised are cold questions of law. In the light of the facts pleaded by plaintiffs, and already set out, and of the further admitted fact that but for the acts of defendant plaintiffs would have been entitled to receive, and would have received, far more than $3,000 in cash, if defendants had accepted cash only,

for these taxes, the question of jurisdiction seems to me so plain as to require neither authority nor exposition. Plaintiffs have already lost more than $3,000; they hold and own $271,500 par value of bonds, of which $62,500 were, when this suit was begun, due and unpaid by an insolvent district. I am of opinion that the amount involved is sufficient to warrant jurisdiction, if a federal question is involved, and I think it is.

Much of the argument of defendants' counsel, on this point and others in the case, is bottomed on a decision of the Supreme Court of Missouri, in the case of State ex rel. Bliss v. Grand River Drainage District, 330 Mo. 360, 49 S.W.(2d) 121. The latter case, however, has since been greatly modified, if not in part overruled, by the later case of State ex rel. Sturdivant Bank v. Little River Drainage District (Mo. Sup.) 68 S.W.(2d) 671, decided February 3, 1934, and not yet reported [in State Reports]. So, the contention of fact of defendants touching jurisdiction should be disallowed.

How stands the case upon the issues of law? Defendants contend that the amendment made to the statute in 1929, and last above quoted, is not unconstitutional. No cases are cited for the faith that is in them, save the Grand River Case, supra, and I am not able, in view of the later case of State ex rel. Bank v. Drainage District, supra, to see anything in the Grand River Case which affords the least consolation to defendants upon this point, or upon any other point involved in the controversy. If so it be that some modicum of reliance is put by defendants upon the cases of Knox v. Lee and Parker v. Davis, 12 Wall. 457, 20 L. Ed. 287, reported as the Legal Tender Cases, their position is not at all helped; for it does not follow that, because the United States may lawfully pass a statute which violates the obligation of a contract, a state may likewise do so. Diametrical differences in their respective sovereign functions and organic laws may so clearly render the statutes of the former legal and the latter illegal as to logically and lawfully account for existing differences. Let us look a moment to these differences in sovereign functions and organic laws:

Disassociated from international exigencies, or, more accurately, from the necessities of commerce between nations, and inhibitions, if any, found in the organic law, every sovereignty has the inherent power to decree anything to be money or a medium of exchange which it may desire; as, witness, the iron coins of Sparta, and among uncivilized tribes, the wampum belts of the American Indians, and the grindstones of the islands of the Southern Seas, and other historical instances of the use as money of practically worthless substances, which are too numerous to mention.

It will be observed that the Federal Constitution nowhere categorically limits money to gold and silver, or even to metallic substances. It does say that "the Congress shall have power * * * to coin money (and) regulate the value thereof." (Const. art. 1, § 8, cl. 5.) If it be argued that the Congress by the use of the transitive verb "coin," in the language quoted, intended that the money of the United States should be limited only to such metals as are capable of being coined or minted, this argument is met by the decision of the Supreme Court of the United States in Knox v. Lee and Parker v. Davis, 12 Wall. 457, 20 L. Ed. 287, the so-called Legal Tender Cases. But such an argument is also met by the very language which concludes the sentence quoted; for, obviously, if the Congress has power to regulate the value of the coined or minted money of the United States, it may, so far as the Constitution is concerned, fix its value, or its so-called precious metal content, so low that, when judged by the standards of other nations, its value will be less than that of the paper on which so-called fiat money is printed.

There is no express constitutional inhibition anywhere to be found which forbids the Congress from passing an act which violates the obligation of a pre-existing contract. Not only will the Federal Constitution be read in vain to find such a provision, but the Supreme Court of the United States has repeatedly so ruled. Hepburn v. Griswold, 8 Wall. loc. cit. 623, 19 L. Ed. 513; Mitchell v. Clark, 110 U. S. loc. cit. 643, 4 S. Ct. 170, 312, 28 L. Ed. 279; Legal Tender Cases, 12 Wall. 457, 20 L. Ed. 287; New York v. United States, 257 U. S. loc. cit. 601, 42 S. Ct. 239, 66 L. Ed. 385. If occasionally the Supreme Court has seemed to find such inhibition, it has deduced it from the so-called spirit of the Constitution (see Hepburn Case, supra), or it has allocated it (many times, no doubt, correctly) among the numerous offspring of that fertile and elastic provision touching "due process of law," found in the Fifth Amendment. It is not, I repeat, to be found in any of the language of either the Constitution, or of the several amendments thereto.

I have never been able to see wherein the unhampered exercise by the Congress of the power to declare what shall be the medium of

exchange at all impinges upon "due process of law" when the constituent elements of that term are considered. Duncan v. Missouri, 152 U. S. loc. cit. 382, 14 S. Ct. 570, 38 L. Ed. 485; State v. Guerringer, 265 Mo. 409, 178 S. W. 65. For there is the very highest judicial authority for the statement that: "Whatever power there is over the currency is vested in Congress. If the power to declare what is money is not in Congress, it is annihilated." Legal Tender Cases, 12 Wall. 379, loc. cit. 545, 20 L. Ed. 287.

Being in the Congress, this power cannot be in any state, because of the paramountcy of federal statutes, and of the Federal Constitution, for the Federal Constitution expressly takes the power from the states to "emit bills of credit (or) make anything but gold and silver coin a tender in payment of debts." Article 1, § 10, United States Constitution. The express power granted to the Congress "to coin money (and) regulate the value thereof" was necessary only in an historical sense, and for the sake of clarity; this, for the reason that each of the original thirteen sovereign states had, in virtue of their sovereignties, the inherent right to say what should be the medium of exchange, or money, within their several jurisdictions. But for this fact, and the further fact that a voluntary union of independent states to form a single sovereign entity was then unique and unusual in this world, it would not have been necessary to confer express power on the Congress to deal with money. But the states each had this power, and it was deemed wise to take it from them. Therefore, induced, evidently, by the settled theory that the Federal Constitution is a grant and not a limitation of power, it was deemed wise to express the power, and this was done. But, I repeat, this was not necessary. The United States having, in effect, taken the power from the states, would have inherited it and possessed it, by virtue of its own sovereignty, even if it had not been mentioned in the organic law.

It is not necessary here to pursue this question so far afield as to consider the effect of a statute which, prior to the day of performance, renders performance impossible (6 R. C. L. 1000), nor to consider further the effect on state decisions of the rule announced in Bronson v. Rodes, 7 Wall. 229, 19 L. Ed. 141, which was, on the point above discussed, unquestionably overruled by Knox v. Lee, 12 Wall. 457, 20 L. Ed. 287. The curious may find well-nigh all of these decisions in a note found in 84 A. L. R. 1499. I leave the question to say, in passing, that a great majority of the state cases disagreed with the doctrine of Bronson v. Rodes; Missouri, among the latter. Henderson v. McPike, 35 Mo. 255; Appel v. Woltmann, 38 Mo. 194.

So, I am of opinion that the United States has, through the Congress, the constitutional power to prescribe by statute what is legal tender for the payment of both public and private debts, either subsequent or antecedent in their accrual to the passage of the law. In fact, this identical thing has been done; it has passed laws, held to be valid, wherein, both directly and by indirection, pre-existing contracts were violated. Moreover, by the Act of June 28, 1834 (4 Stat. 699), it did in principle what is tantamount thereto, that is to say, by the act last above referred to, it decreased the gold content of the gold coins of the United States, which, of course, indirectly, if not directly, impaired the obligations of existing contracts.

In the absence of any provision in the Federal Constitution forbidding the passage of a statute which violates the obligation of a contract, and in the light of the ruling of the Supreme Court in the Legal Tender Cases, supra, it seems impossible to escape the conclusion that the Congress possesses the power to say what shall be the medium of exchange, even though the exercise of the power may indirectly result in the impairment of the obligation of existing contracts. But it does not follow that a state of the Union may do the like, or that it has any such power. This, for the reasons that not only does section 10, article 1 of the Constitution of the United States, forbid a state from passing any law impairing the obligation of a contract, but the Constitution of Missouri itself forbids such a law (section 15, article 2, Constitution of Missouri 1875).

Even, perhaps, if this were not so, as a matter of law, it would become so as a matter of fact, because of the limited amount of gold, and the almost unlimited sum of obligations promised to be paid in gold. I do not lose sight, of course, of the well-known economic fact that, due to normal circulation, a billion dollars in gold may serve to pay several billion dollars of gold obligations, if the gold is moving freely. But there are bound to happen economic exigencies, which hamper normal movement or circulation of the so-called best money, and cause it to hide until the exigency passes. The very situation, which induces and makes necessary a statute which changes the medium of exchange, likewise causes hoarding and an interruption of the normal circulation of the best money.

So, as a practical matter, it makes but little difference whether a debtor, who has agreed to pay his debt in gold, is prevented or relieved from doing so by a statute or by the utter impossibility of getting the gold with which to pay. True, it may be argued that he may get it at a price, if he is willing to pay that price. But such an argument involves the ruin of the many to help and enrich the few, in the teeth of the power of the Congress to "provide for the * * * general welfare of the United States" (section 8, article 1, Constitution of United States), which power connotes, among many other things, the power to pass laws for the benefit of the great majority, rather than a small minority of those who individually go to make up the national entity.

■ I have gone a bit afield, in order to guard against any future charge of inconsistency, if in the light of diametrically different powers such a charge would be logically possible. I am not saying that a state has no constitutional power to pass a statute which makes state and county warrants, and bonds and other obligations, of its own divers subdivisions and instrumentalities of government, legal tender for the payment of debts · due to the state or its subdivisions of government. This a state may do as to future debts. Of course, a state could not make such obligations legal tender for the payment of all debts, both public and private, because of the plain letter of the Federal Constitution. The question here cuts deeper, however, and simply stated, is: May a state by statute change the legal tender in which the debts of its governmental subdivisions are by law made payable, as to debts created on the faith of an existing law, without impairment of the obligation of a contract? I am of opinion that a state has no such power. It is so clear that what is attempted to be done here does violate the obligation of a contract, that the proposition scarcely needs argument or citations of authority. But the cases so holding, both that the thing here done does constitute the violation of the obligation of a contract, and that such is forbidden to a state, are numerous. See Von Hoffman v. City of Quincy, 4 Wall. 535, 18 L. Ed. 403; Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; Green v. Biddle, 8 Wheat. 1, 5 L. Ed. 547; Moore v. Gas Securities Company (C. C. A.) 278 F. 111; Crummer v. City of Ft. Pierce (D. C.) 2 F. Supp. 737; In re Cranberry Creek Drainage District, 202 Wis. 64, 231 N. W. 588, 85 A. L. R. 242.

■ But it is further urged by defendants that since the record disclosed there is a local market for some of the bonds issued by defendant drainage district, for use in the payment of annual taxes, and that when so sold, for this use they are bringing about 60 per cent. of their par value, and that plaintiffs may not hope ever to realize payment in full, or even as much as 60 per cent., they are not entitled to the injunction prayed for. The contention is unique. It amounts, in the last analysis, to saying to plaintiffs that they may not enforce the rights given them by the statutes under which the bonds were issued, and which form a part of their contract, because, in the opinion of defendants and of their witnesses, some other method of getting their money would be financially more profitable to plaintiffs. However altruistic the attitude of defendants may be in this behalf, it is, of course, none of defendants' concern, qua defendants, as to whether or not plaintiffs are ever paid. If plaintiffs see fit, relying upon the terms of their contract, to pursue a course which will end in their undoing, it does not lie within defendants' duty or province to protect them against the results of their own unwise course or acts. As well say to a creditor: "Do not sue me, or you will never get your money; give me time and eventually I may pay you sixty cents on the dollar." I take leave to doubt the legal efficacy of such a defense, and so this contention is disallowed.

■ Lastly, defendants urge that this action cannot be maintained, because plaintiffs are the holders, owners, and bearers of slightly less than one-half the outstanding bonds of the defendant drainage district, and since all of the remaining bondholders are not made either plaintiffs or defendants, an injunction will not lie. It is obvious that, if all of the bondholders were here as plaintiffs, there would be no necessity, as a practical matter, for the bringing of this action; this, for the very simple reason that in such situation, the bondholders could, and should, cure their own ills, by the mere expedient of refusing to sell their bonds for use in paying taxes.

If this contention is considered from the angle of a failure to make all remaining bondholders parties defendant, it is fundamental that before such bondholders can have the right to be made parties their legal rights must, by the action or the decree, be so far affected as that they will be hurt by the judgment rendered. If they are not hurt, and cannot be hurt, obviously, they are not necessary parties.

No decree which this court can render in this case can at all affect the right of any bondholder to sell the bonds held by him to any one who wishes to buy, for any price which may be agreed on. Obviously, on other phases, the contention of defendants begs the question, for it assumes that there exists in any holder of one of these bonds, the legal right to use such bond in the payment of taxes. I have labored to show that there is no such right. If there is such right, under the facts here, that ends the case in favor of defendants. If there is not such right, as I am constrained to conclude, then no bondholder is injured by a decree which prevents him from doing that which he has no legal right to do. In passing, the record is bare of evidence that any bondholder is also a taxpayer in defendant District. The record shows that no one of plaintiffs is a taxpayer.

The late case of Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481 (decided by the Supreme Court of the United States on January 8, 1934), was referred to by defendants' learned counsel, in argument. I have no quarrel with that decision. It gave, in the last analysis, a most necessary and wholesome effect to the "general welfare" clause of the Constitution (article 1, § 8). Moreover, upon the facts therein dealt with, it was as different from the case at bar as daylight is from dark. Therein, the Supreme Court dealt with a moratorium act of the highest emergency, by the state of Minnesota, passed in the midst of a nation-wide depression, which well-nigh submerged this whole Union. Herein, the vexing act was passed in the midst of an apparent prosperity, which amazed the world. There, the Minnesota act in no wise changed the contract or the remedy, but merely extended the time for a legal resort to that remedy; here, the Missouri act, in the very teeth of the Federal and state Constitutions, violated the obligation of a solemn contract in a vital way. The distinction is not novel. In the case of Sturges v. Crowninshield, 4 Wheat. 122, loc. cit. 200, 4 L. Ed. 529, the Supreme Court of the United States long ago said:

"The distinction between the obligation of a contract, and the remedy given by the legislature to enforce that obligation, has been taken at the bar, and exists in the nature of things.

"Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct."

This was seemingly a reference to the nation, but it is equally true of a state.

The defendants, of course, had the right to rely upon the validity of the amendment made to section 9911, supra, in 1929. It was their duty to follow it and not question it, and their acts done under it cannot be brought in question, so long as it stands as valid.

This court has heretofore had occasion, in an oral opinion rendered in the case of Denison v. Little River Drainage District, to pass upon some of the questions mooted herein, and to discuss them at some length, and reference may be made here to that discussion, if curiosity shall so dictate.

It follows from what is said, that the permanent injunction prayed for should issue as prayed, and so it is ordered.