7 F.Supp. 1 (1934)
In re MISSOURI PAC. R. CO.
No. 6935.
District Court, E. D. Missouri, E. D.
June 20, 1934.
*2 Alexander & Green and James H. McIntosh, all of New York City, Fordyce, White, Mayne & Williams, of St. Louis, Mo., for Bankers' Trust and W. H. Bixby, trustees of St. Louis, I. M. & S. Ry. Co.
Edward J. White, of St. Louis, Mo., for trustees.
Davis, Polk, Wardwell, Gardiner & Reed, of New York City, Allen C. Orrick, of St. Louis, Mo., and Edwin S. Sunderland and Leighton H. Coleman, both of New York City, for trustees of First & Refunding Mortgage.
Green, Henry & Remmers and Max O'Rell Truitt, all of St. Louis, Mo., Cassius M. Clay, and Stanley F. Reed, both of Washington, D. C., for Reconstruction Finance Corporation.
Orris Bennett, Sp. Atty., Bureau of Internal Revenue, and Angus D. MacLean, Asst. Sol. Gen., both of Washington, D. C., and Harry C. Blanton, U. S. Dist. Atty., of Sikeston, Mo.
FARIS, District Judge.
The sole question presented here is the validity, vel non, of what I shall call, for brevity and convenience, the gold clause of the bonds secured by the mortgage in which interveners are trustees. This clause provides that these bonds shall be payable in "gold coin of the United States of the present standard of weight and fineness." The word "present," refers to the date of issue of the bonds, which was May 1, 1903.
Interveners contend, and their numerous adversaries, including the trustees of the debtor, deny, that Public Resolution 10, now section 463, title 31, U. S. C. (31 USCA § 463) passed by the Congress on June 5, 1933, is invalid, for that it offends against the Federal Constitution.
No formal pleading points out the part or clause of the organic law, which stand, as a prohibiting monitor to oppose the validity of the above resolution. But the trend of the argument convinces that the "due process" provision of the Fifth Amendment must have been held in mind by counsel for interveners.
So far as is presently pertinent here, section 463, supra, reads thus:
"Every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts."
A few words of almost ancient history may add faint light to the case. Prior to the Civil War, it was a common custom to write into obligations for the payment of money, even into promissory notes, the provision that the debt should be payable in specie. The reason for this precaution was that much of the money then in circulation consisted of paper promises to pay, issued by so-called state banks. See Bronson v. Rodes, 7 Wall. 229, 19 L. Ed. 141. These were notorious for the ease with which they failed. It is not surprising, then, that the payee in an obligation should have endeavored to guard against payment in possibly worthless paper money.
In the fifteen-year period following the Civil War, and until the so-called resumption of specie payment in 1879, provisos for the payment in specie became fewer. There were probably two reasons for this: First, the enaction by the Congress of the Legal Tender Acts, and the decision of the Supreme Court in the Legal Tender Cases, 12 Wall. 457, 20 L. Ed. 287; and, second, because few men were so simple as to contract for payment in gold or specie, which reached *3 at one time in the fifteen-year period a premium, over the greenbacks of the era, of $2.85, or a little more. That is, it took $2.85 in the so-called legal tender money or "greenbacks" to buy a single dollar in gold.
Again, after gold and silver had become either directly or indirectly the monetary backing of well-nigh all of the paper money in circulation, and due it may be to that "prophetic discernment" mentioned by Mr. Justice Hughes (now Chief Justice) in the Schubert Case, 224 U. S. 603, 32 S. Ct. 589, 56 L. Ed. 911, it became and has continued to be the custom to write into bonds a gold clause of the sort here vexing the court. How much of this custom is due to mere conservatism of the lawyers who prepare these obligations and who are prone to walk in the tracks of those who passed that way before them, it is fruitless to inquire.
As forecast, there was, when the custom latterly began, no particular advantage derivable from the insertion of such a proviso. Ordinarily, gold bore no premium; for so-called gold notes passed and repassed on a parity with other paper money including the outstanding residue of greenbacks, although these gold notes, till recently (see Act of March 9, 1933 [12 USCA § 201 et seq.]; Gold Reserve Act January 30, 1934 [31 USCA §§ 315b, 408a, 408b, 441-446, 821, 821a]) could be redeemed on demand for coined gold, dollar for dollar. But this situation did not at all dam the ever-increasing flood of obligations, made payable on their faces in gold. This perhaps in many cases, at least, because the term "payable in gold coin of the United States of the present standard of weight and fineness" is a sonorous and mouth-filling phrase and indubitably it adds a dignity and a glamour of richness to all bonds, particularly to those which the maker had not and never had the remotest intention of ever paying in anything. There is another and political theory, but which, being political, has no place in a judicial opinion. But whether the origin of the custom was fortuitous merely, or considered and sinister, is after all immaterial.
It is of course conceded that the serious question here cannot thus be lightly dismissed, however lightly history may indicate it probably came into the case. For it involves, even though it may have arisen as a mere gesture, a most vital and serious question of constitutional law.
If the above-quoted language of the Congress be valid, then on its face it clearly relieves the debtor from compliance with the provisions of the gold clause of the bonds, and the question is solved; on the other hand, if the Congress had no power under the Constitution to pass Public Resolution 10, the debtor is not relieved from compliance, and the question is largely solved.
Every man of passing intelligence, at all in touch with business, knows that the sum total of bonds and notes in this nation alone, which are "payable in gold coin of the United States of the present standard of weight and fineness," exceeds by many billions the sum of this whole world's existing mined gold. These huge sums are variously estimated at from $90,000,000,000 to $125,000,000,000 of outstanding gold obligations, and $11,000,000,000 of available mined gold, but available only in the sense that it exists in the form of coin or bullion. These facts courts, presumably no less intelligent than mankind in common, may judicially notice. They cannot, of course, notice the exact sum of these extant gold obligations, nor is it important here. All that is relevant are the ultimate facts. When such an ultimate fact, impossible of proof, but known by all men, becomes relevant, especially arguendo as here, a court may take judicial notice of it; because in such case, every man knows it, but no man can prove it accurately, since accurate proof is humanly impossible.
It is, of course, impossible in fact, and it has now become impossible in law, to pay this huge sum of what I may call gold debts out of the world's comparatively meager supply of gold. Learned counsel for the interveners appreciate this impossibility; so they urge upon the court the alternative, not expressly stipulated in the bond, that payment must be made in current paper money, which has the present gold value of the sum agreed to be paid; in short and in effect that the debtor shall be required to pay for each dollar, about 70 cents more in paper money than it agreed to pay in gold.
While the disastrous economic effect of the enforcement of a contract standing alone rarely, if ever, affords a sufficient legal reason against enforcement, it may yet be considered an urgent reason why enforcement should not be decreed, if it is legally possible to avoid it. Germane, at least, if not analogous, is the settled rule in cases for specific performance. So, briefly, let the possible and probable economical effects of the adoption of interveners' contention be considered. It will well-nigh double the sum total of the debts outstanding and now saddled upon transportation and industry, upon states and *4 municipal corporations, and even upon many individuals. For hardly can it be doubted that these, lately staggering toward bankruptcy, under the bare letter of their debts, cannot carry this doubled load and survive. It is scarcely possible that at any time since the so-called depression of 1929 the total fair value of all of the actual wealth in this nation has exceeded the sum of $260,000,000,000. If to the sum of all debts, in whatever medium of exchange payable, there shall be added some $80,000,000,000 more, perforce the enforcement of the alleged alternative of the gold clause, then this country may well be bankrupt, in the sense, at least, that the total sum of its debts exceeds the total fair value of all of its assets. I refer, of course, to debts, both public and private. Concededly, the picture is overdrawn, because, in practice, payment of these vast sums, agreed to be paid in gold, will not contemporaneously be demanded or exacted. But the argument yet discloses a theoretical and perhaps possible situation, which is almost appalling.
So it is obvious, I think, that the upholding of these so-called gold clause contracts would vastly hurt, if not destroy, business, and shake, if not overturn, the entire financial structure of this country. It would, I repeat, bankrupt well-nigh every railroad, every municipality, every road district, or similar instrumentality of state government and wellnigh every state in the Union. And since, in the financial crash of these debtor classes, the creditor classes, now urging the letter of their bonds, might well themselves go down in the common ruin, this situation as already suggested should be avoided, if it is legally possible to do so, within constitutional limits. Specifically, what will happen in the case at bar? Can it be doubted that if the debtor here shall be compelled to pay $743,000,000, upon its mortgage indebtedness of $438,000,000, it will be utterly bankrupted and financially destroyed; that its general creditors and stockholders will get nothing, and even its bondholders will be paid only a part of their inflated debt?
I think it is fairly clear that validity may be decreed, without at all impinging upon the Constitution, and without stating a single novel proposition, but merely by following old rules, many times announced either concretely, or in principle, by the Supreme Court of the United States. And in doing so I shall not find it necessary at all to rely upon that well-settled canon of construction which admonishes that a statute may not be held constitutionally invalid till the court is convinced of invalidity beyond a doubt.
The legal propositions which seem to me to be decisive of the question mooted may be stated in questions. These questions are: (1) In whom, or in what entity in this nation, is the power lodged to say what shall be money, or the medium of exchange, for the payment of public and private debts? (2) If the answer be the Congress, then, has any citizen the constitutional right to so contract as to obstruct or nullify the above power of the Congress? (3) Is not every citizen to be deemed to hold in contemplation, when he makes a contract for the payment of money, the power of the Congress to alter and change the medium of exchange or money of the country, if such power be in the Congress? (4) Can a law or resolution of the Congress be declared invalid, when it does nothing, except to carry out a constitutional power of the Congress? (5) Have subsequent valid changes in the laws pertaining to gold coin rendered strict performance impossible in law? This fourth question is obviously a mere corollary.
The answer to the first premise in the chain of argument and proof, that these gold clause contracts are not enforceable to the ultimate letter of their language and alleged implications, is that the power to say what is money or the medium of exchange under the Constitution is vested in the Congress. Const. art. 1, § 8, cl. 5. Not only does the Constitution itself in full effect, say so; but, had it not said so, the power would yet rest in the Congress, perforce a universal right inherent in all sovereign nations. Lately, in an opinion in the case of Kercheval v. Ross, 7 F. Supp. 355, I had occasion to say this:
"Dissociated from international exigencies, or, more accurately, from the necessities of commerce between nations, and inhibitions, if any, found in the organic law, every sovereignty has the inherent power to decree anything to be money, or a medium of exchange which it may desire; as witness, the iron coins of Sparta, * * * and other historical instances of the use as money of practically worthless substances, which are too numerous to mention.
"It will be observed that the Federal Constitution nowhere categorically limits money to gold and silver, or even to metallic substances. It does say that `the Congress shall have power * * * to coin money (and) regulate the value thereof.' If it be argued, that the Congress by the use of the transitive verb `coin,' in the language quoted, intended that the money of the United States should be limited only to such metals as are capable of *5 being coined or minted, this argument is met by the decision of the Supreme Court of the United States in Knox v. Lee and Parker v. Davis, 12 Wall. 457, 20 L. Ed. 287, the so-called Legal Tender Cases. But such an argument is also met by the very language which concludes the sentence quoted; for, obviously, if the Congress has power to regulate the value of the coined or minted money of the United States, it may, so far as the Constitution is concerned, fix its value, or its so-called precious metal content, so low that, when judged by the standards of other nations, its value will be less than that of the paper on which so-called fiat money is printed."
Again, in this case of Kercheval v. Ross, discussing the physical absence of any constitutional prohibition against the passage by the Congress of an act which violates the obligation of a contract, I said this:
"There is no express constitutional inhibition anywhere to be found which forbids the Congress from passing an act which violates the obligation of a pre-existing contract. Not only will the Federal Constitution be read in vain to find such a provision, but the Supreme Court of the United States has repeatedly so ruled. Hepburn v. Griswold, 8 Wall. loc. cit. 623, 19 L. Ed. 513; Mitchell v. Clark, 110 U. S. loc. cit. 643, 4 S. Ct. 170, 312, 28 L. Ed. 279; Legal Tender Cases, 12 Wall. 457, 20 L. Ed. 287; New York v. United States, 257 U. S. loc. cit. 601, 42 S. Ct. 239, 66 L. Ed. 385. If occasionally the Supreme Court has seemed to find such inhibition, it has deduced it from the so-called spirit of the Constitution (See Hepburn Case, supra,) or it has allocated it (many times, no doubt, correctly) among the numerous offspring of that fertile and elastic provision touching `due process of law,' found in the Fifth Amendment. It is not, I repeat, to be found in any of the language of either the Constitution, or of the several amendments thereto."
Again, in this same case of Kercheval v. Ross, without at all intimating criticism of the Supreme Court, as is shown by the exception I made above, I said:
"I have never been able to see wherein the unhampered exercise by the Congress of the power to declare what shall be the medium of exchange at all impinges upon `due process of law,' when the constituent elements of that term are considered. (Duncan v. Missouri, 152 U. S. loc. cit. 382, 14 S. Ct. 570, 38 L. Ed. 485; State v. Guerringer, 265 Mo. 409, 178 S. W. 65). For there is the very highest judicial authority for the statement that:
"`Whatever power there is over the currency is vested in Congress. If the power to declare what is money is not in Congress, it is annihilated' (Legal Tender Cases, 12 Wall. loc. cit. 545, 20 L. Ed. 287)."
Also, in the Kercheval Case, in order arguendo to prove the thesis that the power to say what shall be money is inherent in a sovereign, I took occasion to say, this:
"The express power granted to the Congress `to coin money (and) regulate the value thereof,' was necessary only in an historical sense, and for the sake of clarity; this, for the reason that each of the original thirteen sovereign States had, in virtue of their sovereignties, the inherent right to say what should be the medium of exchange, or money, within their several jurisdiction. But for this fact, and the further fact that a voluntary union of independent states to form a single sovereign entity was then unique and unusual in this world, it would not have been necessary to confer express power on the Congress to deal with money. But the States each had this power, and it was deemed wise to take it from them. Therefore, induced, evidently, by the settled theory that the Federal Constitution is a grant and not a limitation of power, it was deemed wise to express the power, and this was done. But, I repeat, this was not necessary. The United States having, in effect, taken the power from the States would have inherited it and possessed it, by virtue of its own sovereignty, even if it had not been mentioned in the organic law. * * *
"So, I am of opinion that the United States has, through the Congress, the constitutional power to prescribe by statute what is legal tender for the payment of both public and private debts, either subsequent or antecedent in their accrual to the passage of the law. * * * Moreover, by the Act of June 28, 1834 [4 Stat. 699] it did in principle what is tantamount thereto, that is to say, by the Act last above-referred to, it decreased the gold content of the gold coins of the United States, which, of course, indirectly, if not directly, impaired the obligations of existing contracts."
"In the absence of any provision in the Federal Constitution forbidding the passage of a statute which violates the obligation of a contract, and in the light of the ruling of the Supreme Court in the Legal Tender Cases, supra, it seems impossible to escape the conclusion that the Congress possesses the *6 power to say what shall be the medium of exchange, even though the exercise of the power may indirectly result in the impairment of the obligation of existing contracts."
But the truth of this basic premise, in no way rests on my humble views, or on the rather plain language of a construable organic law; it rests on the decisions of the highest court in the land. See Legal Tender Cases, 12 Wall. loc. cit. 543, 20 L. Ed. 287; Veazie Bank v. Fenno, 8 Wall. 533, 19 L. Ed. 482.
From the above statement of the location of this power, the Supreme Court has never receded. Indeed, the truth of it is rendered so plain and simple, both by history and by logic, that it is almost amazing that it ever became necessary for the Supreme Court to point out the lodgment of the power.
If the premise laid down in the first question be proven, and none I feel sure will be hardy enough to deny it, I come in the argument, to the second premise, embodied in the second question, supra, which is:
Can any citizen (and I include, of course, corporations) be permitted to hamper, obstruct, forestall, or hamstring the Congress in the exercise of its power to declare what shall be money? It seems to me that the simple statement of the question furnishes its own answer. Again, in addition to the obvious answer dictated by the plainest and simplest logic and the reason of the thing, there is ample authority furnished by the numerous decisions of the Supreme Court of the United States, in cases on all fours in principle.
In my opinion, under many rulings of the Supreme Court of the United States, there can be no doubt that contracts, good when made, may become bad and incapable of enforcement, by reason of the passage by the Congress, acting within its constitutional limits, of subsequent prohibitions against the enforcement of such contracts. As witness, numerous cases decided by the Supreme Court of the United States which actually, or in effect, abrogated prior but perfectly good contracts, when such contracts were subsequently banned or forbidden by the Interstate Commerce Act (49 USCA § 1 et seq.). Just a few of these may be cited. See Louisville & Nashville R. Co. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 S. Ct. 96, 44 L. Ed. 136; Philadelphia, B. & W. R. Co. v. Schubert, 224 U. S. 603, 32 S. Ct. 589, 56 L. Ed. 911; New York v. United States, 257 U. S. 591, 42 S. Ct. 239, 66 L. Ed. 385.
In the Case of Schubert, supra, the Supreme Court said, at page 613 of 224 U. S., 32 S. Ct. 589, 592, this:
"To subordinate the exercise of the Federal authority to the continuing operation of previous contracts would be to place, to this extent, the regulation of interstate commerce in the hands of private individuals, and to withdraw from the control of Congress so much of the field as they might choose, by prophetic discernment to bring within the range of their agreements. The Constitution recognizes no such limitation. It is of the essence of the delegated power of regulation that, within its sphere, Congress should be able to establish uniform rules, immediately obligatory, which as to future action, should transcend all inconsistent provisions. Prior arrangements were necessarily subject to this paramount authority." (Italics are mine.)
Before the above-quoted pronouncement, the Supreme Court had said, upon a question, in principle wholly germane, this:
"Long before the above cases were decided it was said in Legal Tender Cases [Knox v. Lee], 12 Wall. 457, 550, 551, 20 L. Ed. 287, 311, 312; that `as, in a state of civil society, property of a citizen or subject is ownership, subject to the lawful demands of the sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority.'
"These principles control the decision of the present question. The agreement between the railroad company and the Mottleys must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable, or to impair its value. That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations is inconceivable. The framers of the Constitution never intended any such state of things to exist." Louisville & Nashville R. Co. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 270, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671.
In principle, I am wholly unable to distinguish the question before the Supreme Court, when it spoke as above quoted, from that of the question now confronting me in the case at bar. If I may immodestly venture *7 to be dogmatic, I assert the impossibility of distinguishing these questions. The powers of the Congress within the field of permissible legislation cannot be obstructed or nullified, by what Mr. Justice Hughes (now Chief Justice) characterized in the Schubert Case, supra, as "prophetic discernment." Any other and different conclusion, would be well-nigh abhorrent to both logic and common sense. For, I repeat, one who makes a contract, in a matter within the field of permissive congressional legislation, must be deemed to do so with the knowledge that a subsequent act of the Congress may render void his solemn agreement. This rule and principle, which is not capable of distinction here, runs through the very warp and woof of the Federal Constitution. It has been invoked, and it has served to revoke and abrogate an antecedent contract valid when made, between a lawyer and his client (Calhoun v. Massie, 253 U. S. 170, 40 S. Ct. 474, 64 L. Ed. 843); between a railroad and the holder of a free pass, issued antecedently and upon a good consideration (Louisville & Nashville R. Co. v. Mottley, supra); between an employee and a railway, when, sued under the Employers' Liability Act (45 US CA §§ 51-59), the railway set up an antecedent contract barring the beneficiary in a relief fund from maintaining an action for damages for personal injuries (Philadelphia B. & W. R. Co. v. Schubert, supra); between the United States and a bridge company, which constructed a bridge in navigable waters under state legislative sanction, valid when made (Union Bridge Co. v. United States, 209 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; Monongahela Bridge Co. v. United States, 216 U. S. 177, 30 S. Ct. 356, 54 L. Ed. 435). It is not alone, I repeat, in the fields of interstate commerce, navigable waters, and lawyers' contracts for a fee for the recovery of money and pensions from the government, that the right of the individual to forestall and obstruct the Congress by an antecedent contract is denied. The same principle has repeatedly been applied by the Supreme Court in matters of riparian rights (see, Scranton v. Wheeler, 179 U. S. 141, 21 S. Ct. 48, 45 L. Ed. 126; Greenleaf, etc., Co. v. Garrison, 237 U. S. 251, 35 S. Ct. 551, 59 L. Ed. 939; Willink v. United States, 240 U. S. 572, 36 S. Ct. 422, 60 L. Ed. 808; Cubbins v. Mississippi, 241 U. S. 351, 36 S. Ct. 671, 60 L. Ed. 1041; Jackson v. United States, 230 U. S. 1, 33 S. Ct. 1011, 57 L. Ed. 1363), and under the several Bankrupt Acts (see Hanover Nat. Bank v. Moyses, 186 U. S. 187, 22 S. Ct. 857, 46 L. Ed. 1113; Canada Southern Ry. Co. v. Gebhard, 107 U. S. 527, 3 S. Ct. 363, 27 L. Ed. 1020; In re Klein, Fed. Cas. No. 7865; Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529).
It is difficult, if not impossible, to conceive of an act of the Congress which more clearly destroys in many phases, the obligations of antecedent contracts, than does a Bankruptcy Act. The creditor is presently forbidden to sue till the lapse of a stated period (section 29, title 11, U. S. C., section 205, subd. (l) title 11, U. S. C. [11 USCA § 29 and § 205 (l)]), and absolutely forbidden to sue after the discharge of the bankrupt. He must take but a part of his debt, and he must accept a composition forced on him by the votes and acts of others, when such composition and the taking of but a part are in the very teeth of his contract. Yet, because the Constitution relegated this subject to future congressional action, Bankruptcy Acts, however destructive to existing contractual rights, have been up to now uniformly upheld.
But a little diligence will unearth many other cases, which fully uphold the basic principle above announced. As forecast, the cases I cite above uphold the principle, that when a person makes a contract involving a subject-matter within the ambit of the Congress' constitutional field of permissive legislation, he does so at the peril that the Congress may so change or modify the law as to render his contract void or unenforceable.
The above considerations and the cases cited prove, I think conclusively, the truth and correctness of the third question. Questions (2) and (3) are wholly germane, and the answer to one furnishes the answer to the other. It has long been necessary, in order at all to enforce the law, to indulge the conclusive presumption that every citizen knows the law. Actually, of course, the presumption is a fiction, but it is so necessary a fiction that it is settled. So, if it be true, that the power to say what shall be money, be lodged in the Congress, then when a citizen makes a contract for the payment of his debt in gold, he must be deemed to have saddled himself with the knowledge, and to have had in contemplation the possibility, that his contract may become unenforceable, through the exercise by the Congress of the power to declare something other than gold to be money. But I am not called on here to further belabor this well-settled doctrine, or to cite any of that multitude of cases, which, without a dissenting voice uphold it; because *8 counsel for interveners concede in their briefs that "all the parties to these contracts are conclusively presumed to have known the law."
Coming to the proposition, or premise (4), which, as said is a mere corollary: Can a law, or resolution of the Congress be deemed, or held to be invalid, when it does nothing, except to carry out a power conferred on it, both by the Constitution and by virtue of the inherent sovereign right of the entity, for which the Congress is empowered to legislate. Again the question answers itself, even if the Supreme Court had not already repeatedly answered it. That answer is so plain and obvious as not to call for either exposition or the citation of authority.
In addition to the language already quoted from Public Resolution 10, the Congress saw fit to declare, in a preamble to this resolution, a policy of the Congress and to characterize gold clause contracts as being designed and calculated to "obstruct the power of the Congress to regulate the value of the money of the United States and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the market and in the payment of debts."
No attack is made here by counsel for interveners, for that the Congress has no power to declare a continuing and ever-binding policy; nor is that question at all relevant or involved here. It is enough that it has been declared to meet what the Congress deemed a present and pressing emergency. But learned counsel for interveners, in both their oral and printed arguments do insist most ably and strenuously that no public policy is at all involved in a matter of private contract between a corporation and individual bondholders as here.
I submit with deference that they have in this assumption fallen into grave error, in my opinion. Their conclusions upon the point are tantamount to the assertion that any two members of our national compact bottomed as it is, on representative government, may flout and disobey both the organic law and the mandate of their government, and arrogate to themselves a power which, as I labor to show, has been solemnly committed to the Congress alone. If this may be done by two contracting parties in any given contract, I see no reason why it may not be done in every contract; with at least the theoretical result to turn business and commerce back to ancient barter, or swapping of commodities. Commerce between the states, over which the Congress certainly has power, would be hampered or destroyed, and the only debts left payable in money would be debts due to and from the government itself. Surely, the power in the Congress to say what shall be money is not to be restricted to a medium of exchange, which is to be binding only when the government pays or is paid. No such narrow meaning is to be found in the language of the Supreme Court when it declared that "if the power to declare what is money, is not in the Congress, the power is annihilated."
Concededly, neither national policy, nor the Congress, is at all concerned ordinarily in the terms of any moral private contract, so long as that contract does not infringe upon, nullify, or circumvent a law of the Congress which it had the constitutional power to pass. It is a settled rule of law that a thing which may not be done directly, may not lawfully be done indirectly. Obviously, no two persons can by a private contract directly repeal a law passed by the Congress, and so by the same token they cannot do so by indirection.
But when all is said, the language of the preamble above quoted has little to do with this case. For the Congress used it as mere argument for the action it purposed taking, so I, in effect, have used it, in an effort lawfully to uphold, what the Congress did. But if the point were vital, it would I think lose all force, in view of the power of the Congress to forbid by suitable statutes the use as money of anything not put out under its own authority. See Veazie Bank v. Fenno, 8 Wall. 549, 19 L. Ed. 482; Merchants' National Bank v. United States, 101 U. S. 1, 25 L. Ed. 979; Briscoe v. Kentucky Bank, 11 Pet. 257, 9 L. Ed. 709; Sturges v. Crowninshield, 4 Wheat. 193, 4 L. Ed. 529; Ling Su Fan v. United States, 218 U. S. 302, 31 S. Ct. 21, 54 L. Ed. 1049, 30 L. R. A. (N. S.) 1176.
The policy which troubles here is that deducible from and expressed in the resolution itself. This policy, as forecast, is attacked by interveners by the bold contention that no private contract, whatever its terms and implications, and whatever its effects upon business, commerce, and the nation may be, is any concern of the Congress. Cases no doubt may be found which sustain this general contention in principle, but not in the broadness for which interveners here contend. Existing complexities of life, business, science, *9 and commerce have compelled a broader, saner, and more correct view.
Apposite to this view and illustrative of the concept, the Chief Justice of the United States, speaking for a majority of the Supreme Court, in the late case of Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 241, 78 L. Ed. 413, 88 A. L. R. 1481, said this:
"Where, in earlier days, it was thought that only the concerns of individuals or of classes were involved, and that those of the state itself were touched only remotely, it has later been found that the fundamental interests of the state are directly affected; and that the question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends."
Again, and more recently, both the ordinary rule, and in fair effect, the exceptions to it and the modifications of it, are tersely stated by Mr. Justice Roberts in the case of Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 510, 78 L. Ed. 940, 89 A. L. R. 1469, thus:
"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."
There is no subject on which the Congress is permitted to act which is more vital to labor, industry, and commerce than is the question of what shall be money. While, of course, in the business of the world, actual money is used in probably only one-fiftieth of the world's business, checks upon bank credits accounting for the remainder. This proportion is further vastly increased by the fact that banking experience discloses that about one-tenth of the total amount of deposits furnishes a sufficient safeguard. Concededly, the money of the nation is in the final analysis behind these checks and bank credits. So, if the money and credits of a country are permitted to pass into hands which close upon them, the effect upon labor, industry, and commerce are destructively disastrous, and, therefore, the matter of what shall be money is a matter in which the nation, and the Congress which legislates for it, is most vitally concerned.
But as mentioned already, another contention is put forward by those who urge the validity of the gold clause. In that contention, they say, that even if the debt cannot be paid in gold, they are yet entitled to payment in such sum in currency as shall equal the present gold value of the number of dollars involved; in short, in gold, or its equivalent. I think it ought to be sufficient to say of this contention, that it is not "so nominated in the bond." In other words, the contract does not say that if gold is no longer money when pay day comes, then payment shall be made in such money as is current; but on the basis of the amount of current money which a gold dollar will buy. I think the very terms of the contract preclude such a judgment.
The gold clause here vexing is not a promise to pay these bonds in gold as money. It is a promise to pay in gold, not as money, but as a mere commodity; the bulk whereof, or the quantity of gold to be paid, to be equal to the gold content of $1,000 of gold coin of the United States of the standard of weight and fineness as of May 1, 1903. See Gregory v. Morris, 96 U. S. loc. cit. 624, 24 L. Ed. 740; Bronson v. Rodes, 7 Wall. 229, 19 L. Ed. 141; Butler v. Horwitz, 7 Wall. 260, 19 L. Ed. 149. In short, it is a mere agreement of barter, or swapping of commodities. If in 1903 the contract had been that thirty years later the maker would pay to the holder of each bond 100 piculs of Chinese opium, how would the case stand? Since 1903, the Congress, having the power to do so, has forbidden the importation of opium (except under conditions designed to limit its use to medicinal purposes) and made the possession of it, in ordinary hands, a criminal offense. Act May 26, 1922, 42 Stats. 596 (21 USCA § 171 et seq.). Thus, since the contract to pay in piculs of opium has, since the contract was made, become impossible of performance by operation of law, what would be the situation? In law, I assume the contract would be void; in equity, the rights of the maker as well as those of the payee would be considered, and not those, as here insisted, of the payee alone. These equities, involving the alternative of utter destruction of the debtor herein and total losses to its unsecured creditors and stockholders, I have already pointed out. In such situation a court of equity might well say to the payee, that having seen fit to contract for payment not in *10 money, but in a presently unobtainable commodity, the money of payment must be such money as the law provides in ordinary cases, and to be measured in quantity by tale and not by the market price of the opium in 1934. The contention, I repeat, involves writing into the contract language neither expressed nor implied by its actual terms. It is a trite truism to say, that rarely, if ever, is a contract for the payment of a fixed sum of money carried out by the payment in money having the identical so-called purchasing power of the dollar agreed on, as and when agreed on. Between the date of the contract and the day of payment, the dollar will usually, if not always, rise or fall when measured in terms of purchasing power. When regard is had to the precise nature of money, this contention, absent a contractual basis, has but little more to sustain it than would the contention that payment in terms of dollars should be bottomed on the price of wheat. That is to say, if a dollar will, when the contract is made, buy two bushels of wheat, but when payment falls due the same dollar will buy only one bushel of wheat, then instead of the dollar agreed to be paid, $2 shall be exacted. And this, too, when the contract, as here, is silent on the point. Money is merely a medium of convenience through which wealth and labor are measured and moved in business and commerce, and between man and man.
But the contention that, absent as here, the legal and practical possibility of payment in gold coin, their debt must be paid in the equivalent of gold, is that on which interveners mainly and most confidently rely. Concededly, their reliance is bottomed on persuasive and most exalted authority, so far as concerns the bare rule of stare decisis. This cannot be said of any other of their contentions in this case. Upon the point that they are entitled to be paid in current paper money, which according to its present value is the equivalent of the gold dollars of their contract, they not only cite a recent decision of the English House of Lords, and two decisions of the Permanent Court of International Justice, but a line of cases decided by the Supreme Court of the United States, among which as typical are Gregory v. Morris, 96 U. S. 619, 24 L. Ed. 740; Trebilcock v. Wilson, 12 Wall. 687, 20 L. Ed. 460, and Bronson v. Rodes, 7 Wall. 229, 19 L. Ed. 141.
The decisions first above mentioned are merely persuasive, as coming from two great and learned tribunals. But as an inferior court, I am in duty bound to follow the rulings of the Supreme Court, unless it is legally possible to distinguish the case at bar from the facts, the law, and the situation existing, when the Gregory Case, the Trebilcock Case, and the Bronson Case were up for judgment.
Hampered by this bounden duty, there is yet small consolation in the fact that before Bronson v. Rodes, supra, and even after it, and until coerced by the decision of the Supreme Court in Trebilcock v. Wilson, supra, and by the federal supremacy in the matter, therein declared, a majority of the highest courts in the several states of the Union disagreed with the doctrine of Bronson v. Rodes. See note, 84 A. L. R. 1503 et seq.
Moreover, the learned writer of the above note, upon the point whether the question here vexing has been finally and authoritatively settled, says this:
"Although the validity and enforceability of provisions in contracts for payment in gold or cold coin have been sustained by many cases in this country, including a number of decisions by the Federal Supreme Court, the question cannot now apparently be regarded as authoritatively settled because of changes in legislation and in conditions. Both the interpretation and enforceability of the contract may conceivably be affected by these changes."
It may well be and arguendo conceded, that when resort is had for guidance to abstract justice and cold logic, the conclusions reached in each of the cases relied on by interveners are impeccable. But they were the result of the application of what I may call pure natural justice as contradistinguished from that same justice affected and modified by policy, statute, and Constitution. Natural justice is that tenet of philosophy which weighs the rights of mankind through the exercise of the most refined logic and fairness. It is germane, if not identical, with that ideal justice discussed and defined by Plato and Aristotle. But its field of operation must be unhampered by factual impossibility of performance or by restricting statutes, organic laws, or policies of state. So, if such justice shall infringe upon national policy, or the Constitution, or be opposed by a valid statute, it cannot be administered or applied.
This at first glance may seem harsh, but it must be borne in mind that in a republic, laws are made and policies are established by and for the greatest number for the greatest good; by and for the majority and not for the few. The latter may even be harmed *11 in person or property by the enforcement of a statute, which while harming the few yet helps the great majority. Ours is a government by law and not of men. Having adopted a Constitution, which defined the limits of legislative permission, we then delegated to the Congress, elected by the greater number of the people, the duty to represent and speak for all of the people in fixing policies and making laws. Every law deprives a few men of the alleged right to do what they wish to do, but that does not make the law bad, since it merely forbids the few from doing acts which harm the many. So, in fact, I think the harshness of the rule is upon the debtor and not upon the creditor.
Can it be doubted that the Congress had the right to say to those who had made contracts, the effect of which was to forestall and circumvent the Congress itself, that having usurped a power belonging to the Congress, they must give it back, because the exercise of it by a few willful men would vastly harm this country? Again, can there be any doubt that it would do so? It cannot, of course, be doubted that if payment be decreed to be made in the paper money equivalent of gold, the power of the Congress in the premises will be just as effectually thwarted and nullified, as if payment in gold were decreed.
In each of the cases, and classes of cases above mentioned and relied on by interveners, gold was readily obtainable (see Bronson v. Rodes, supra, 7 Wall. loc. cit. 251, 19 L. Ed. 141), nor was the possession of it, at the time and place fixed for payment, forbidden by law. Payment in gold in neither case was forbidden by either policy or statute. Here at bar, payment in gold, and even the possession of enough gold with which to make payment, are forbidden to both payee and maker, and gold is wholly unobtainable. See Gold Reserve Act, January 30, 1934, 48 Stat. 340 (31 USCA §§ 315b, 443). It was not so in the Gregory, Bronson, and Trebilcock Cases. Moreover, those cases, in effect, ruled that since the maker of the obligation involved had agreed to pay in gold or specie, and since he could lawfully obtain the agreed commodity of payment, he must do so, but if he saw fit not to pay in the commodity agreed on, he could offer and the payee must accept the equivalent in current paper money.
Reverting to, and elaborating the notion that factual and legal impossibility of performance excuses the breach of a contract, I quote what was said on the point by Judge Van Devanter (now Mr. Justice Van Devanter), in the case of United States v. Dietrich (C. C.) 126 F. 671, loc. cit. 674, thus:
"It is well established by the English courts and by the courts of this country, federal and state, that where performance of a contract or agreement, lawful in its inception, becomes unlawful by reason of any subsequent event, the contract or agreement is thereby dissolved or terminated, in so far as it remains executory, and both parties are excused from its further performance."
Nor is the legal situation at all affected, for that the bonds in question here fell due May 1, 1933. This for the reasons that the Act of March 9, 1933, was then in force, and the properties of the debtor were then in custodia legis.
I think the above considerations serve to distinguish the cases relied on by interveners from the facts and law up for decision in the case at bar.
Finally, interveners contend that, conceding the power of the Congress to pass a valid law, which indirectly renders void an antecedent contract, yet it may not pass a law which directly does the like.
Obviously, this contention is based on mere modality, and not on final result of the law. Likewise, the contention carries the tacit admission, and briefs of counsel the express assertion that the Congress may do indirectly that which it has no power to do directly. No cases are cited by counsel for the above doctrine, and I know of none which uphold it. I had deemed the law to be that a legislative body, no more than an individual, could do indirectly that which it had no lawful power to do directly. Quite often it has been ruled by the Supreme Court that a state Legislature could not in a law, by a mere subterfuge of intentional, or even of unintentional, confusion, bring about indirectly a legal result which it had no power to bring about directly. If in short the law on its bare face purported to produce a result in a field wherein the result was permissible, yet if the actual result was to invade a field wherein the result was prohibited, the law could not stand. This indicates that courts are concerned only with ultimate results, and not merely with the technical mode of consummation. I think the contention is in principle answered by the Nebbia Case and the Blaisdell Case, supra, as well as others I have cited herein.
Moreover, that identical thing which interveners seem to concede may be done lawfully has already been done in this case by laws and acts in pais, in nowise here attacked. *12 For on January 31, 1934, pursuant to power conferred by the Act of May 12, 1933 (31 USCA § 821), the President by proclamation reduced the gold content of the gold dollar, by comparison (cf., section 315, Title 31, U. S. C. [31 USCA § 315]), to a little more than 59 cents. But for other legislation (which I have already discussed) which took gold coin out of circulation, and forbade possession of it, payment in these deflated gold dollars would have had the identical effect of indirectly violating the obligation of interveners' contract. It would, I think, be an anomalous situation, if the Congress has the power to do indirectly a thing it possesses no power to do directly. As forecast, it is settled, I think, that a thing which cannot be done directly cannot be done indirectly. By parity of reasoning it seems clear that a thing which can be done indirectly can also be done directly. Germane to the notion, what was said in the Schubert Case, supra, seems apposite, thus: "Prior arrangements were necessarily subject to this paramount authority."
Summing up the premises laid down in the beginning, it seems to me impossible to escape these legal conclusions: (a) That in the Congress alone is lodged the power to say what shall be used as money; (b) no person in this nation has the right to make a contract the effect of which is to nullify, obstruct, or circumvent the power of the Congress to say what shall be the national money, or medium of exchange; (c) every person who enters into a contract is, in law, conclusively deemed to hold in contemplation the power of the Congress to alter and change the nature and so-called value of the medium of exchange, or money of the nation; (d) no law passed by the Congress can be invalid when it does no more than to carry out a power vested by the Constitution in the Congress; and (e) subsequent valid laws have rendered strict performance of the terms of the gold clause legally impossible.
And so it follows, that Public Resolution 10 is in my opinion valid; that the gold clause is therefore unenforceable in the ultimate letter thereof as urged by interveners, and is enforceable in equity only, to the extent that interveners, as trustees, are entitled to recover, or to be paid on each $1,000 par value bond in controversy, the sum of $1,000 in such money of the United States as is now current, or as shall be current when the final decree herein for payment is entered.
Let an order be presented for settlement and entry, accordingly.