# Proposed Changes in Operation of
# the Witness Protection Program

The Attorney General has broad discretion in administering the Witness Protection Program established under Title V of the Organized Crime Control Act of 1970, and his decisions in this connection are not subject to judicial review under the statute.

Two proposed changes in the administration of the Program, dealing with the settlement of existing debts by persons entering the Program and with the custody of children brought into the Program, are generally within the Attorney General's authority. However, certain modifications should be made to protect fully the due process rights of persons entitled to litigate or enforce custody and visitation rights against a participant in the Program. Whether the proposed changes provide constitutionally adequate protection for either creditors unable to satisfy their claims because of the government's refusal to disclose the identity of persons in the Program, or for persons within the Program whose identity is disclosed to creditors, may depend on the facts of each case.

The proposed changes would not subject the government to liability under the Federal Tort Claims Act, because they come within an exception to the waiver of sovereign immunity in that Act. Nor would they subject the government to liability for contract damages under the Tucker Act.

December 29, 1982

## MEMORANDUM OPINION FOR THE
## ASSOCIATE ATTORNEY GENERAL

This memorandum responds to your request for our opinion concerning proposed changes in the operation of the Witness Protection Program (the Program). For the reasons outlined in detail in this memorandum, we conclude that all of the proposed changes are legally permissible, although we recommend certain additional modifications in the handling of child custody litigation to alleviate certain constitutional concerns present in the Program even after adoption of the proposed changes.

## I. Description of Program and Proposed Changes

Under the Program, which was established under Title V of the Organized Crime Control Act of 1970, Pub. L. No. 91–452, §§ 501–504, 84 Stat. 922, 933–34 *reprinted in* notes prec. 18 U.S.C. § 3481 (1976) (Crime Control Act), the Attorney General is authorized to protect witnesses and families of witnesses whose lives might be placed in danger as a result of their testimony against organized crime figures. The Attorney General has delegated the authority to provide this protection to the United States Marshals Service (the Marshals

Service). *See* 28 C.F.R. § 0.111(c) (1982). In discharging these duties, the Marshals Service ordinarily assigns marshals to guard participants or relocates them with new identities in a new area of the country. The Service generally assures the continued security of participants who have been relocated by refusing to disclose their new identity to members of the public.[1] However, this policy of concealing the new identities of relocated participants has led to two general problems.

The first arises when witnesses have accumulated large debts before entering the Program. When a witness enters the Program, he signs a form agreement, called a Memorandum of Understanding, in which he agrees to "settle" all of his debts with creditors.[2] Frequently, however, witnesses do not fulfill this pledge, and creditors attempting to sue on claims against a witness in the Program are unable to enforce any judgment against the witness because they cannot learn his new location and identity. Currently, the Marshals Service will assist a creditor only by forwarding his mail and legal process to the witness. If the witness refuses to appear at any judicial proceeding or to satisfy any judgment, the creditor lacks any avenue for securing relief.

The second problem arises when a participant is sued by an ex-spouse or other person outside the Program seeking to obtain custody of a child who was brought into the Program.[3] In some cases, the witness or his spouse has legal custody of the child when they enter the Program, but the ex-spouse sues to modify the prior order granting one of them custody. In other cases, children have been brought into the Program in violation of a court order granting the ex-spouse custody. The Memorandum of Understanding signed by the witness specifically states that the Marshals Service will not permit the witness to bring children into the Program in violation of a court order,[4] but witnesses and/or their spouses have defied this prohibition without the knowledge of the Marshals Service or government attorneys.[5] The Marshals Service facilitates child custody litigation by transmitting mail and legal process to the witness and spouse, by assuring the security of any legal proceedings, and by paying the counsel fees of impecunious witnesses and spouses. It does not currently disclose the new identity of a witness or his spouse, however, even though the witness may refuse to participate in any judicial proceeding or to conform to any judgment.

Any solution to these recurrent problems must reconcile the needs of the government, witnesses, and the spouses of witnesses to conceal the participants' new identities with the right of creditors and ex-spouses to satisfy their legitimate

---

[1] The Marshals Service will disclose a participant's new identity to a law enforcement official seeking to arrest the participant for a felony committed before his entrance into the Program.

[2] Memorandum of Understanding at 5 (supplied with opinion request)

[3] We generally will use the term "ex-spouse" throughout this memorandum We assume, however, that custody suits may also be brought by persons who are not ex-spouses but who nevertheless have legal custody or visitation rights. In addition, for the sake of convenience, we will refer to the ex-spouse as female and the witness as male, although the opposite could just as well be true.

[4] *See* Memorandum of Understanding at 5.

[5] *See, e.g , Salmeron* v *Gover,* No. 81-047 (D.D.C 1981) (Marshals Service and ex-spouse of witness agreed in a consent decree approved by the court to return child brought into Program by witness in violation of a state custody order)

legal claims. Accordingly, it has been proposed that the Marshals Service adopt the following policy. First, in cases where creditors bring suit against a witness, or where ex-spouses bring suit against a witness or his spouse, the Marshals Service would arrange for a secure courtroom, service of process on the defendant, and reimbursement of counsel fees of an indigent defendant. Second, in the situation where an ex-spouse obtains "legal custody" of a child, the Marshals Service would accept service of the relevant court order, arrange for the order to be sealed and validated for the ex-spouse in the jurisdiction where the child resides, and permit the local sheriff to execute the order. The Marshals Service would not disclose to the ex-spouse the new identity or the location of the child. It would also not inform the sheriff that he was seizing a child who was living with a witness and/or his spouse. If the security of the witness or his spouse were threatened by the return of an older child who knew their new identities, they apparently would be relocated. Finally, in the circumstance where a creditor secures a "money judgment" against the witness which the witness refuses to satisfy, officials of the Department of Justice would assume the authority, when justice and fairness requires, to disclose the identity and location of the witness to the creditor.[6] Their decision would be based on a weighing of the following factors: "the size of the judgment, the circumstances of the particular swindle or other act, the witnesses' continued need to law enforcement, as well as other factors in the particular case," which we assume would include the financial ability of the witness to satisfy the legal claims.[7]

You have asked us to examine whether any of the proposed changes would violate the Memorandum of Understanding or any other provision of law. The following five legal issues which are raised by the proposal and the operation of the Program are discussed in detail in this memorandum.

First, does the Crime Control Act authorize the Attorney General to adopt the proposed changes? For reasons outlined below, we conclude that the Attorney General has the statutory authority to adopt these procedures.

Second, would the proposed changes subject the government to liability under the Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, for any injury that a participant might sustain as a result of the disclosure of his identity? Under the Tort Claims Act, the federal government has waived its immunity from suit in certain circumstances for the violation of state tort law by its employees. In our view, however, the proposed changes would not subject the government to tort liability because they come within an exception to the waiver of sovereign immunity in the Tort Claims Act.

Third, would the proposed changes subject the government to liability under the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491, which waives the federal government's immunity from damages for its violation of the terms of certain of

---

[6] For obvious reasons, we recommend that any regulation which is ultimately adopted for the Program provide that these decisions be made by persons holding particular offices, rather than providing that specific individuals make these decisions.

[7] The proposal does not consider the hypothetical situation in which a creditor only sues a non-witness participant. Because a non-witness participant is normally a family member of the witness, and the witness might be responsible for his debts under state law, these suits may well become suits against the witness himself.

its contracts? If the Memorandum of Understanding is an enforceable contract and precludes any of the proposed changes, the government could be liable for damages under the Act. We conclude, however, that even assuming the Memorandum of Understanding is an enforceable agreement, the proposed changes would not subject the government to contract damages because they would not violate the terms of the Memorandum of Understanding.

Fourth, would the proposed changes in the treatment of custody cases, although not themselves illegal, go far enough in protecting the constitutional rights of ex-spouses in their relationship with their children in the Program? In our view, while the proposed changes alleviate many of the constitutional problems in the operation of the Program, they do not adequately protect the constitutional rights of ex-spouses when the government's hiding of a witness precludes the ex-spouse from litigating her custody and visitation rights to a child. Accordingly, we recommend that, in addition to the proposed procedures, the Marshals Service consider disclosing the participant's new identity in certain circumstances.

Finally, would the Program, along with the proposed modifications, adequately protect the constitutional rights of creditors who are unable to satisfy their claims because the Marshals Service will not disclose the identity of the debtor/witness in their cases? As we have said, under the proposed modifications, the Marshals Service would disclose witnesses' identities to creditors in some egregious cases, but not in all cases. Since resolution of this legal question is dependent on the factual circumstances in which such claims arise, we are not in a position to state a categorical general conclusion to this class of questions. This issue should be reexamined after the proposed changes have been adopted and the courts have had occasion to examine this question in concrete factual situations arising under the Program. We cannot say at this time, however, that the proposed modifications would not adequately protect the constitutional rights of creditors.

## II. Authority to Adopt the Proposed
## Procedures Under the Crime Control Act

In authorizing the Attorney General to establish and administer the Program, the Crime Control Act states in pertinent part:

> Sec. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.
>
> Sec. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons

intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

*Reprinted in* notes prec. 18 U.S.C. § 3481. Under these provisions, the administration of the Program is left largely to the "judgment" and "determin[ation]" of the Attorney General. He is not required to protect any witness. He may "offer" to protect a witness and his family "whenever, in his judgment," the witness' testimony would place "his life or person, or the life or person of a member of his family or household, in jeopardy." Once a person has accepted an "offer" of protection, the person "may" only continue to use government "facilities for as long as the Attorney General determines the jeopardy to his life or person continues." As the House Report on this provision observed, Congress intended to "give[ ] the Attorney General broad authority to determine the particular facilities to be afforded and the length of time the facilities should be available." H.R. Rep. No. 1549, 91st Cong., 2d Sess. 48 (1970). *See also* S. Rep. No. 617, 91st Cong., 1st Sess. 59–60 (1969).

This broad discretion of the Attorney General in administering the Program is underscored by Congress' failure to provide for witnesses or their families to bring suit to be accepted into the Program, to receive any particular type of protection, or to prevent termination from the Program. Moreover, no such intent is implicit from the structure and language of the statute.[8] Thus, the Act does not

[8] In *Cort v. Ash*, 422 U S. 66 (1975), the Supreme Court identified four factors in determining whether Congress had implicitly intended to create a private right of action under a statute. Three of these factors militate against finding an implied private cause of action under the Crime Control Act.

The first factor is whether the plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted' —that is, does the statute create a federal right in favor of the plaintiff?" *Id*. at 78 (Emphasis in original.) The Crime Control Act does not give any "especial" class of persons a right to protection; it merely *authorizes* the Attorney General to offer protection if he believes the witness' testimony might place the witness or his family in jeopardy. Once a witness has been selected for the Program, he "may" continue to use its "facilities" for as long as the Attorney General determines his life is still in jeopardy. But this does not create a "right" to protection in specific "right or duty creating language [which] has generally been the most accurate indicator of the propriety of implication of a cause of action." *Cannon* v. *University of Chicago*, 441 U S. 677, 690 n 13 (1979). Rather than declaring that the witness "shall have a right" to protection in the specified circumstances, as Congress has provided in other cases where the Supreme Court has found an implied cause of action, *see id.*, the Act merely states that he "may" receive protection when, according to the *subjective* judgment of the Attorney General, the witness' life or person continues to be in jeopardy In this context, we do not believe that the statute can be said to "create a federal right in the favor of the plaintiff." *Cort* v. *Ash*, 422 U.S at 78 *Cf. Universities Research Assn* v *Coutu*, 450 U S. 754, 772 (1981) (" 'far less reason' " to imply cause of action "where Congress, rather than drafting the legislation 'with an unmistakeable focus on the benefited class,' instead has framed the statute simply as a general prohibition or a command to a federal agency") (quoting *Cannon* v. *University of Chicago*, 441 U S. at 690–92).

The second and third factors can be analyzed together They are whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one;" and whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." *Cort* v. *Ash*, 422 U.S. at 78. As discussed *supra*, the language and the legislative history of the Crime Control Act reveal that Congress intended to grant the Attorney General broad discretion in administering the program. Moreover, the substantive standard

Continued

825

make decisions of the Attorney General in administering the Program subject to judicial review under the statute. *See Garcia* v. *United States,* 666 F.2d at 963; *Melo-Tone Vending* v. *United States,* 666 F.2d at 690; *Leonhard* v. *United States,* 633 F.2d at 623. *Cf. Doe* v. *United States,* 224 Ct. Cl. 632 (1980).[9]

In determining whether this broad grant of authority permits adoption of all of the proposed changes, two types of decisions in the operation of the Program must be separately considered.

## A. Selection of Witnesses and Coordination of Their Protection

The first type of decision relates generally to the Attorney General's selection of persons to participate in the Program and the coordination of their protection once they have been selected. There appears to be little doubt that the Crime Control Act gives the Attorney General the widest authority to adopt those proposals that directly involve only these issues. Thus, the Attorney General's delegee in the exercise of this authority—the Marshals Service—would clearly be permitted to arrange for service of process on participants and to provide secure courtrooms for participants to litigate their cases. The Crime Control Act would also authorize the payment of attorney fees of impecunious participants in the circumstances which have been recommended, although this conclusion requires a somewhat more detailed explanation.

The Act grants the Marshals Service the authority to provide for the "health, safety, and welfare" of witnesses. Under this authority, the Service currently

---

which the Attorney General is to apply in making his decisions—jeopardy to the witness' life or person—is not easily amenable to judicial scrutiny. Both of these facts suggest that Congress did not intend the Attorney General's decisions to be subjected to judicial review. The final factor—whether this is a cause of action "traditionally relegated to state law," *id.*—is inapplicable to this case.

Because three of the four factors cited by the Court in *Cort* v. *Ash* weigh decidedly against finding a private right of action under the Program, we believe, as the First, Second and Fifth Circuits held in *Melo-Tone Vending* v. *United States,* 666 F.2d 687, 690 (1st Cir. 1981); *Leonhard* v. *United States,* 633 F.2d 599, 623 (2d Cir. 1980). *cert. denied* 451 U.S. 908 (1981); and *Garcia* v. *United States,* 666 F.2d 960, 963 (5th Cir. 1982), that neither a creditor, ex-spouse, or a witness, respectively, can bring suit under the Act.

[9] Two panels in the Second Circuit have suggested an alternative reason why the federal government may not be sued under the Crime Control Act. Congress, in their view, has not waived the government's sovereign immunity to suit under the Act. *See Doe* v *Civiletti,* 635 F.2d 88, 94 (2d Cir 1980); *Leonhard* v. *United States,* 633 F.2d at 623. While resolution of the sovereign immunity issue would not affect the government's liability because we believe there is no private right of action under the Act, *see Sea-Land Service* v. *Alaska Railroad,* 659 F.2d 243, 245 (D.C. Cir. 1981), *cert. denied,* 455 U.S. 919 (1982); *Hill* v *United States,* 571 F.2d 1098, 1102–03 (9th Cir. 1978), there is reason to doubt that courts outside the Second Circuit would find the government immune from suit in these circumstances. The courts in *Doe* and *Leonhard* reasoned that the Crime Control Act does not waive sovereign immunity for suits brought against the government under the Act, and that the general waiver of sovereign immunity for injunctive relief in the 1976 amendment to § 702 of the Administrative Procedures Act does not waive immunity in cases, such as those brought under the Crime Control Act, where jurisdiction arises under 28 U.S.C § 1331, the general federal question provision. *See also Estate of Watson* v *Blumenthal,* 586 F.2d 925, 932 (2d Cir. 1978) (interpreting waiver of immunity under § 702 not to apply to cases arising under § 1331). Numerous courts outside the Second Circuit, however, have rejected this narrow interpretation of the 1976 amendment and have held that it waives sovereign immunity to injunctive relief for all suits brought against the federal government. *See Schnapper* v. *Foley,* 667 F.2d 102 (D.C. Cir. 1981), *cert. denied,* 455 U.S. 948 (1982); *Sea-Land Service* v. *Alaska Railroad,* 659 F.2d at 245 n.2; *Newsom* v. *Vanderbilt University,* 653 F 2d 1100 (6th Cir. 1981); *Beller* v *Middendorf,* 632 F 2d 788 (9th Cir. 1980), *cert. denied,* 452 U.S. 905 (1981); *Sheehan* v *Army and Air Force Exchange Service,* 619 F.2d 1132, 1139 (5th Cir. 1980), *rev'd on other grounds,* 456 U.S. 728, 733 n.3 (1982); *Jaffee* v *United States,* 592 F.2d 712, 718–19 (3d Cir.), *cert. denied,* 441 U.S. 961 (1979); *Hill* v. *United States,* 571 F 2d at 1102. Thus, it is probable that at least these courts would find that the federal government has waived its sovereign immunity to injunctive relief under the Crime Control Act.

makes subsistence payments to some participants when they are first relocated. The hiring of an attorney appears to be permissible under this same authority. More importantly, however, the hiring of an attorney is frequently compelled, in our view, by the witness' cooperation with the government and is thus related to the Attorney General's statutorily authorized goal of protecting the participant's new identity. Very likely, for example, some custody disputes occur because relocation of a participant effectively extinguishes the visitation rights of the non-custodial parent. The participant's financial situation may deteriorate as a result of his rapid liquidation of assets and relocation. Once a suit has been brought in these cases, moreover, the safety of the participant may require him to hire an outside attorney, rather than to interview potential witnesses or present his case himself. Finally, the resolution of custody and debtor disputes may be more important because of the participant's entry into the Program. A participant who loses custody of a child may be effectively foreclosed from ever seeing his child again. On the other hand, a participant's loss of a suit to a creditor could lead the Marshals Service to disclose his new identity under the proposed procedures. In all of these cases, therefore, the participant's need to hire an attorney may result directly or indirectly from the danger to his life resulting from his cooperation with the government. Accordingly, we believe that the Crime Control Act authorizes but does not require the Attorney General to pay the attorneys' fees of impecunious participants under the circumstances you have described.

Although several statutes restrict the employment of private attorneys by the federal government, we do not believe they would prohibit the payment of private attorneys' fees under these circumstances. These provisions require that, except as authorized by law, officers of the Department of Justice must conduct all litigation "in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor. . . ." 28 U.S.C. § 516. *See also* 28 U.S.C. § 519.[10] In the custody and debtor disputes which are described in the proposal, however, neither the United States, an agency, or an employee would be a party or an interested person.

## B. Termination of Witnesses from the Program

The second type of proposed change in the operation of the Program concerns the termination of witnesses or members of their families from the Program, such as when a witness' identity is disclosed to a creditor or a child is returned to an ex-spouse. These actions raise different legal issues because the Act specifically provides that a person who has entered the Program "may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues." *Reprinted in* notes prec. 18 U.S.C. § 3481. This clause does not restrict the Attorney General's authority to oversee the "facilities" provided the witness and his family—that is, to determine the nature and extent of their

---

[10] The Department of Justice has recognized a narrow exception to this prohibition where a conflict of interest requires the employment of outside counsel *See* 28 C F.R. §§ 50.15(a)(5) & (a)(6), 50 16 (1982)

protection. An argument could perhaps be made, however, that it restricts the Attorney General's right to terminate a witness and his family from the Program by requiring the Attorney General to determine that their lives or persons are no longer in jeopardy. While the distinction between terminating a witness' participation and changing the nature of his protection is not always clear, disclosing a participant's new identity or arranging the return of a child would normally constitute termination from the Program, assuming no further provision was made for their protection after disclosure.

Despite the ambiguity of the language in the statute, for two reasons we believe that the Attorney General is clearly authorized to terminate witnesses from the Program in the circumstances that have been proposed.

First, the section itself only provides that the witness "may" use the facilities so long as the Attorney General believes his life remains in danger. By using the word "may," Congress appears to have intended only that protection of a witness *could* continue after any trial for as long as the witness' life remained in danger, not that the Attorney General was required to provide such protection. *See* 116 Cong. Rec. 35292 (1970) (remarks of Rep. Poff). The only court to consider this question, *Garcia* v. *United States*, 666 F.2d at 963–64, has found that this sentence does *not* limit the Attorney General's otherwise broad discretion to decide when to terminate participants from the Program. We agree with this decision, although it is possible that other courts could reach an opposite conclusion if the government were to terminate a witness on patently unreasonable grounds.[11]

Second, even if the Attorney General's authority to terminate a witness' participation were interpreted to be limited by this language, we do not believe the clause prohibits the Attorney General from disclosing a participant's identity or arranging for the return of a child under the circumstances which have been proposed. With respect to the witness, the Attorney General's authority to disclose his new identity to a creditor follows implicitly from the Attorney General's power to impose and enforce regulations in the administration of the Program. For example, the Attorney General can clearly condition a witness' acceptance into the Program, as he currently does through the Memorandum of Understanding, on the witness' pledge to settle all prior debts. Once the Attorney General has accepted a witness into the Program, he may insist that previously unsettled debts be satisfied. Such a restriction is not qualitatively different from many others imposed by the Marshals Office, such as prohibiting a participant from returning to his old address, or using his new identity to commit fraud. In light of the Attorney General's authority to impose these requirements, it follows logically that he should be able to take reasonable actions to enforce them. This would necessarily include the right to disclose the identity of a witness in those

---

[11] The witness in *Garcia* had repeatedly and flagrantly violated the terms of his protection by giving numerous press interviews revealing his new identity and location. *See* 666 F.2d at 962. He was discharged and readmitted into the Program three times. Because the language of the statute and the legislative history are somewhat ambiguous, we cannot exclude the possibility that another court confronted with a more compelling factual circumstance would find the Attorney General's authority more restricted.

egregious cases where the witness is using the Program as a shield against a legitimate creditor and where there is no reasonable alternative for satisfying the claim.[12]

The Attorney General would also have the authority to arrange for the return of a child to an ex-spouse with lawful custody, although for somewhat different reasons.[13] If a state court has granted the ex-spouse custody, and that decision is legally enforceable against the participant, the Attorney General is not terminating the child from the Program by arranging his return. Rather, the child, whose legal interests are protected by the state court and the parent with custody, is in effect withdrawing from the Program. As a matter of policy, we would of course strongly advise that the Attorney General inform the state court of any possible danger to the child, especially where the custody decision was rendered before the child entered the Program. The Crime Control Act, however, would not prohibit the Attorney General from complying with any resulting decision that the ex-spouse had custody. Accordingly, the return of the child, like the disclosure of a witness' new identity to a creditor, would not be prohibited by the Crime Control Act, whether or not the provision described above is interpreted to place a specific limitation on the Attorney General's authority to terminate a participant from the Program.

### III. Potential Government Liability to a Participant Under the Federal Tort Claims Act

Assuming the Crime Control Act *authorizes* the Attorney General to adopt the proposed procedures, the important question remains whether the Program, along with the proposed changes, violates any other statute or constitutional provision. We begin this examination with the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80.

The Federal Tort Claims Act generally waives the federal government's immunity for tort claims "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Several states have recognized that the government can be held liable in tort for failing to provide adequate protection for a government informant whom officials had reason to believe was in danger because of the assistance he provided to the government. *See, e.g., Gardner* v. *Village of Chicago Ridge,* 219 N.E.2d 147 (Ill. 1966); *Schuster* v. *City of New York,* 154 N.E.2d 534 (N.Y. 1958); *Chapman* v. *City of Philadelphia,* 434 A.2d 753 (Pa. Super. 1981). Federal courts have recognized the federal government might be held liable under the Federal Tort Claims Act for failing to protect an informant under the same theory. *See Miller* v. *United States,* 530 F. Supp. 611,

---

[12] We presume that in the circumstances you have described there would be no other reasonable means for enforcing the money judgment against the witness without disclosing his new identity

[13] The Attorney General's authority to discipline those who ignore his regulations on child custody does not appear independently to justify returning a child to an ex-spouse insofar as the child's rights are concerned. The child has not violated any of the Program's requirements. Nor can the child avoid any sanctions, as the participant can, simply by complying with the directions of the Marshals Service

615 (E.D. Pa. 1982); *Crain* v. *Krehbiel*, 443 F. Supp. 202, 214 (N.D. Cal. 1977); *Swanner* v. *United States*, 309 F. Supp. 1183, 1187–88 (M.D. Ala. 1970). *Cf. Leonhard* v. *United States*, 633 F.2d at 625 n.39. Thus, any of the proposed procedures which subjected the participant to increased danger, such as disclosure of his new identity to a creditor, might give rise to a cause of action under state tort law if the participant were subsequently harmed.[14]

The *proposed procedures* would not themselves subject the government to liability, however, because they come within a specific exception to the waiver of sovereign immunity under the Federal Tort Claims Act. Section 2680(a) states that the waiver of immunity does not apply to

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, *in the execution of a statute or regulation, whether or not such statute or regulation be valid,* or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

(Emphasis added.) Under this provision, the federal government is immune from tort liability for its adoption of regulations, or the execution of regulations by officials exercising due care. *See Dalehite* v. *United States*, 346 U.S. 15, 33 (1953); *Miller* v. *United States*, 583 F.2d 857, 868 (6th Cir. 1978); *Powell* v. *United States*, 233 F.2d, 851, 854 (10th Cir. 1956). By including this exemption, Congress intended that "the legality of a rule or regulation should [not] be tested through the medium of a damage suit for tort." H.R. Rep. No. 1287, 79th Cong., 1st Sess. 6 (1945). Thus, assuming the proposed changes are adopted as regulations, as we presume they would be,[15] they would not independently subject the federal government to tort liability.[16] Only the failure of Department officials to exercise due care in implementing the regulations of the Witness Protection Program could subject the government to tort liability, *see Hatahley* v. *United States*, 351 U.S. 173, 181 (1956), and we see no basis for refusing to adopt an otherwise valid regulation providing for disclosure under the circumstances discussed here.

---

[14] Alternatively, an ex-spouse or witness might bring suit for tortious interference with his or her relationship with a child admitted or terminated from the Program. *See Ruffalo* v. *Civiletti*, 539 F Supp 949, 953 (W D. Mo 1982).

[15] We caution that the adoption of new procedures for the Program should be undertaken only after notice and comment. *See* 5 U S.C. § 553

[16] Because we assume the proposed procedures will be adopted as regulations, we need not address whether they would fall within the other exception in § 2680(a)—the "discretionary function" exception Under this exception the federal government is immune from liability for the decisions of officials performing a "discretionary function or duty" or carrying out directions or policies that were formulated in the exercise of such discretion. *See Dalehite* v. *United States*, 346 U S. at 34–36. We note, however, that two courts have found that at least certain types of decisions made in the operation of the Program may not be protected by this exception *See Ruffalo* v. *Civiletti*, 539 F. Supp. at 953 (allegedly negligent decision to include child of witness in Program); *Miller* v. *United States*, 530 F. Supp. at 615 (allegedly negligent protection of a witness) *But cf. Bergmann* v. *United States*, 689 F.2d 789 (8th Cir. 1982) (government's negligent selection and supervision of protected witness in the Program held to be within discretionary function exception), *Leonhard* v. *United States*, 633 F 2d at 625 (decision not to give continued support to or supervise persons in Program within discretionary function exception)

## IV. Potential Government Liability to a Participant Under the Tucker Act: the Memorandum of Understanding

The other basis upon which the proposed procedures might subject the government to statutory liability is the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491. Under the Tucker Act, the federal government has generally waived its sovereign immunity for money damages for breach of contract. *See Hatzlachh Supply* v. *United States*, 444 U.S. 460, 463, 465 n.5, 466 (1980). Thus, the form Memorandum of Understanding, signed by a representative of the Marshals Service and the witness, could arguably subject the government to liability for money damages if it is a binding contract and if it prohibits the Marshals Service from disclosing the witness' identity in the circumstances which it has been proposed to disclose his identity.

A review of the terms of the Memorandum of Understanding currently used by the Marshals Service, however, reveals that it would not prohibit disclosure under the proposed procedures, even if it were a binding agreement, an issue we need not decide. The only proposed procedures that the Memorandum of Understanding might affect are those that could place a witness in danger, namely, disclosure of his identity to a creditor or return of a child to an ex-spouse. Yet, the Memorandum specifically provides that the government will not shield a witness from the claims of his creditors or from ex-spouses seeking custody of children. The introduction states that the Marshals Service "will not shield the witness from civil or criminal litigation initiated prior to or subsequent to entry into the Program" (p. 2). The section on "Debts and Related Legal Matters" provides that the failure to settle all debts before entering the Program "will jeopardize the witness' participation in the Witness Protection Program since the Marshals Service will not shield witnesses from legitimate creditors" (p. 5). Similarly, in the same section, the Memorandum states that "[c]ourt orders which grant custody of minor children to persons other than the witness who is being relocated will be honored and said MINOR CHILDREN WILL NOT be relocated in violation of the court order" (p. 5) (emphasis in original). Finally, the Attorney General retains the right under the Memorandum to terminate any witness' participation in the Program for reasons he deems "appropriate" (p. 1). This would presumably include the authority to disclose the witness' location to a creditor or his child's location to a sheriff seeking to enforce a child custody decree. In light of all of these provisions, the Memorandum of Understanding, in our view, would not subject the Marshals Service to liability for taking the actions discussed in your proposed procedures.

Despite this conclusion, we recommend that the Marshals Service amend the Memorandum of Understanding to set forth in detail the broad powers of the Attorney General to terminate participants from the Program, including, but not limited to, those situations covered in the proposed changes. All new entrants to the Program should be required to sign this form, and the Marshals Service should also attempt to have persons who are already participating in the Program to sign such an amended form. This would assure that all participants have the

831

clearest notice possible of the obligations of their participation in the Program, that they would be cognizant of the need to comply with the restrictions of the Program, and that they would be less likely to engage in protracted and costly litigation over the operation of the Program.

## V. Constitutional Limitation on Operation of Program: Protection of an Ex-Spouse's Relationship with a Child

Having determined that there is no statutory impediment to the adoption of the proposed procedures, various constitutional issues raised by the proposal remain to be considered. We begin with the issue of whether the proposed procedures adequately protect the constitutionally protected relationship between the ex-spouse and her child in the Program. In our view, the proposed changes which provide for enforcement of valid custody decrees make important improvements in protecting this interest, but ultimately may not go far enough in assuring that the ex-spouse's constitutional rights are not violated. To explain this conclusion, we consider in some detail the constitutional protection for the ex-spouse's relationship with her child and the extent to which the proposed procedures protect this interest.

### A. Constitutional Interests

According to various court decisions, the ex-spouse's relationship with her child, which is regulated by state law, is deserving of constitutional protection in these circumstances for two reasons—one substantive and the other jurisdictional.

The substantive reason is that courts have held that the relationship between the ex-spouse and the child represents a "fundamental liberty interest" deserving of substantive and procedural protection under the Due Process Clause of the Fifth and Fourteenth Amendments. *Santosky* v. *Kramer,* 455 U.S. 745, 753 (1982). As the Supreme Court has observed, the Court's "decisions have by now made plain . . . that a parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter* v. *Dept. of Social Services,* 452 U.S. 18, 27 (1981) (quoting *Stanley* v. *Illinois,* 405 U.S. 645, 651 (1972)). *See also Quilloin* v. *Walcott,* 434 U.S. 246, 255 (1978); *Wisconsin* v. *Yoder,* 406 U.S. 205, 231–33 (1972); *Stanley* v. *Illinois,* 405 U.S. 645, 651–52 (1972); *Meyer* v. *Nebraska,* 262 U.S. 390, 399–400 (1923).[17] This constitutional protection, moreover, has a procedural

---

[17] Although the Supreme Court's decisions in this area have primarily examined limitations on the government's authority to terminate a child's relationship with his family, rather than to mediate between parents in a child custody dispute, *see Caban* v *Mohammed,* 441 U S. 380, 414 n 27 (1979) (Stevens, J , dissenting), the language and logic of the Court's decisions would clearly extend some constitutional scrutiny to the termination of a parent's relationship with his child in the context of a child custody dispute. *Cf. Quilloin* v. *Walcott,* 434 U S. at 255 Lower courts have extended constitutional scrutiny in similar types of situations. *See, e.g., Morrison* v. *Jones,* 607 F 2d 1269, 1275 (9th Cir. 1979), *cert denied,* 445 U.S. 962 (1980), *Ruffalo* v *Civiletti,* 539 F Supp. at 952 (1982); *Roe* v *Conn* , 417 F Supp 769, 777 (M D Ala 1976) (three judge court) *But cf Leonhard* v *Mitchell,* 473 F 2d 709 (2d Cir. 1973) (discussed in detail below)

aspect: even where the state has a sufficiently compelling justification for terminating the ex-spouse's interests, its actions "must be accomplished by procedures meeting the requisites of the Due Process Clause." *Santosky* v. *Kramer,* 455 U.S. at 753 (quoting *Lassiter* v. *Dept. of Social Services,* 452 U.S. 18, 37 (1981)). *See also Stanley* v. *Illinois,* 405 U.S. at 658. Thus, serious constitutional problems could be raised if the operation of the Program substantially infringes upon the ex-spouse's relationship with the child without "a strong countervailing interest" of the federal government or without affording the ex-spouse procedural due process.

The relationship of the ex-spouse with the child is also deserving of protection from federal intrusion because the Marshals Service has no authority to make child custody and visitation decisions. Obviously, nothing in the Crime Control Act or its legislative history suggests that Congress intended to federalize child custody law or to authorize Marshals Service officials to make legally binding child custody decisions. Moreover, even if it had, such a grant of authority could raise serious Tenth Amendment problems. *See National League of Cities* v. *Usery,* 426 U.S. 833 (1976). "The whole subject of the domestic relations of husband and wife, parent and child," as the Supreme Court has noted, "belongs to the laws of the States and not to the laws of the United States." *In Re Burrus,* 136 U.S. 586, 593–94 (1890). *See also Lehman* v. *Lycoming,* 458 U.S. 502, 511–12 (1982); *United States* v. *Yazell,* 382 U.S. 341, 352 (1966); *Wise* v. *Bravo,* 666 F.2d 1328, 1332 (10th Cir. 1981). Thus, absent a compelling countervailing government interest in a particular case, the operation of the Program should, in our view, generally assure that the ex-spouse's constitutionally protected and state defined custodial interest in the child is not effectively terminated as a result of the federal government's hiding of the child.

## B. Protection of an Ex-Spouse's Custodial Rights Under the Program

The proposed changes in the operation of the Program go a long way toward satisfying this requirement, and thus we strongly recommend their adoption. Unfortunately, as a detailed description of these procedures reveals, they may not protect the ex-spouse's custodial interests adequately in every situation.

Under the proposed procedures, the Marshals Service would arrange for the enforcement of a valid and enforceable state judicial decision granting custody of the child to the ex-spouse. Although not discussed in the proposal, the following constitutional and statutory requirements would have to be fulfilled for the decision to be legally binding against the participant and therefore for the government to arrange for its enforcement. First, the court must have satisfied the constitutional requirement of notice, that is, the participant must have received " 'notice reasonably calculated, under all the circumstances, to apprise [him] of the pendency of the action and afford [him] an opportunity to present [his] objections.' " *Armstrong* v. *Manzo,* 380 U.S. 545, 550 (1965) (quoting *Mullane* v. *Central Hanover Trust Co.,* 339 U.S. 306, 314 (1950)). Second, the court must have "personal jurisdiction" over the participant so as to satisfy the Due

Process Clause of the Fourteenth Amendment. Under this standard, there must be "sufficient connection between the [participant] and the forum State to make it fair to require defense of the action in the forum." *Kulko* v. *Superior Court of California*, 436 U.S. 84, 91 (1978). *See International Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945). Third, as a matter of state law, the decision must be legally enforceable against the participant in the state in which it was rendered and in the state in which the child and participant currently reside.[18]

The policy of enforcing custody decisions that meet these requirements would normally satisfy ex-spouses' custodial rights because most ex-spouses should be able to find a state forum that could meet these requirements, and litigate their claims. By agreeing to forward process through the mail, for example, the Marshals Service assures that the participant has been provided notice and an opportunity to be heard. Therefore, any subsequent judgment would not be invalid for lack of adequate notice. *Stanley* v. *Illinois*, 405 U.S. at 657 n.9.[19] Moreover, under the Uniform Child Custody Jurisdiction Act, which has been adopted by at least 46 states,[20] one state always has jurisdiction over custody disputes. *See* § 3(a)(4). All states which have adopted the Act recognize a decision rendered by another state in conformity with the dictates of the Act. *See* § 13. Finally, we assume that, in most of these cases, the defendant would have had sufficient personal contacts with at least one state before he entered the Program to satisfy the personal jurisdiction requirements of the Due Process Clause. Thus, because the ex-spouse probably would not need to learn the new identity of the participant in order to litigate any claim or to enforce any subsequent custody decision, we doubt that the Marshals Service's proposed policy would often create constitutional problems.

Nevertheless, there may be cases where an ex-spouse is unable to litigate her claims because the witness has not had sufficient contacts with any state before he entered the Program, and thus the ex-spouse is unable to obtain personal jurisdiction. In our view, under the general reasoning of the Supreme Court decisions cited above, the Marshals Service normally would be constitutionally required to disclose the participant's identity in these rare circumstances, so long as the witness otherwise had an opportunity to litigate the case in a secure

---

[18] The Supreme Court has held that a state is not constitutionally required to give full faith and credit to a custody decree of another state if the state court finds that there are changed circumstances to justify a change in custody *See Halvey* v. *Halvey*, 330 U.S. 610 (1947), *Kovacs* v. *Brewer*, 356 U S. 604 (1958). Because a state court can always find changed circumstances, there is, in practice, no absolute constitutional requirement that a state court enforce an out-of-state custody decree. Of course, it may do so, as a matter of comity, under its own laws

[19] We believe it is also important, as you have proposed, to provide a secure environment where the witness can litigate his claims. Although the due process requirements of an "opportunity to be heard" do not obligate the government to provide all persons with a secure courtroom if they believe their lives are threatened, the operation of the Program might nevertheless create practical, if not constitutional, problems if witnesses under government protection are forced to choose between risking their lives or not litigating claims to child custody Because the proposed changes would avoid these problems, we need not decide whether it would be unconstitutional in this specific and unusual context not to provide the witness with a secure environment to litigate these claims. *Cf Little* v. *Streater*, 452 U.S. 1 (1981) (state constitutionally obligated to pay for blood tests for indigent defendants in paternity suit); *Lassiter* v. *Dept. of Social Services*, 452 U S. 18 (1981) (state obligated to provide counsel for indigent parents in certain parental termination hearings); *Mathews* v *Eldridge*, 424 U S. 319 (1976).

[20] *See* S. Katz, Child Snatching. The Legal Response to the Abduction of Children, 155–62 (1981). Children, pp. 155–62 (1981).

environment and to waive objections to personal jurisdiction.[21] In some of these cases the ex-spouse will never have litigated the question of custody before the participant had entered the Program. Thus, failure to disclose the participant's new identity would absolutely deprive the ex-spouse of the opportunity to litigate her constitutionally protected claim to custody of the child. Even where the issue of custody had previously been litigated, and the participant had been awarded custody before he entered the Program, the failure to disclose his identity would preclude the ex-spouse from relitigating the custody issue in light of the child's participation in the Program and the extinction of the ex-spouse's visitation rights. The ex-spouse's claim to learn the participant's new identity in all of these cases would be especially weighty because the participant could avoid the constitutional problem by waiving objections to personal jurisdiction. *See, e.g.,* *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee,* 456 U.S. 694, 698 (1982); *McDonald* v. *Mabee,* 243 U.S. 90, 91 (1917). The most recent case to have considered an ex-spouse's right to learn the new identity of her child, *Ruffalo* v. *Civiletti,* 539 F. Supp. 949, generally supports the conclusion that the government has an obligation to protect the custodial interest of the ex-spouse in such circumstances. The court in *Ruffalo* denied summary judgment for the government in a suit by an ex-spouse for damages resulting from admission of a child into the Program. While no final decision has been reached in the case, the court indicated that the government's assistance in depriving a spouse of custodial rights to her child could subject it to damages.

The only other decision to reach this question, *Leonhard* v. *Mitchell,* 473 F.2d 709, may appear to be inconsistent with this view, but we believe it should be read narrowly in light of its special factual and legal context. In *Leonhard* the Second Circuit held that the refusal of the government to disclose a child's new identity to an ex-spouse did not violate a "clear constitutional right," *id.* at 713, and therefore it denied a mandamus action to force disclosure. The court in *Leonhard,* however, was faced with the stark choice of either disclosing the witness' identity, which the government argued would result in the witness' and the child's death, or protecting their identity. There was no mechanism in that case, as there would be under the proposed procedures, for permitting a witness to litigate his claim in a safe environment. The decision in *Leonhard,* moreover, was rendered before the most recent Supreme Court decisions establishing a clearer constitutional basis to a child's relationship with his parents. The lack of clear precedent was important to the *Leonhard* court's conclusion that the plaintiff had not met the burden required for a writ of mandamus. For these reasons, we believe *Leonhard* should not be read to support the government's refusal to disclose the witness' identity where the witness could litigate the issue of custody without threat to his life.[22]

---

[21] In practice, the threat to disclose the participant's identity in these circumstances might force the participants to waive objection to personal jurisdiction, thereby avoiding the constitutional problem Thus, the inability of a spouse to obtain personal jurisdiction may not pose a significant problem.

[22] The witness in *Leonhard,* moreover, had custody of the child when he entered the Program. The government's responsibilities might well have been different if the government had admitted the child into the Program when the witness did not have custody.

We raise only one caveat to this conclusion. Disclosing the new identity of a recalcitrant participant could place the lives of the child and the participant's spouse in danger. Thus, the Marshals Service could argue in such cases that it has a sufficiently compelling interest to justify withholding the new identity of the participant, despite his recalcitrance, because disclosure would endanger the lives of other persons in the Program. Although it is impossible to judge whether or in what factual circumstances courts would accept this view, we recommend that the Marshals Service avoid this constitutional dilemma by offering to provide independent protection for the child and spouse during the pendency of litigation in such cases.

## C. Protection of Ex-Spouse's Visitation Rights

Assuming that an ex-spouse has been given an opportunity to litigate and arrange for the enforcement of any custody decision, a separate constitutional problem remains with regard to the effect of the proposed policies on her visitation rights. Unlike the situation of a custody dispute, where the proposed changes, along with our recommendations, assure that any valid custodial interest of an ex-spouse is vindicated, the operation of the Program necessarily requires the extinction of an ex-spouse's visitation rights.[23] This raises two constitutional questions—one substantive and one procedural.

The substantive issue is whether it is constitutional to terminate the visitation rights of an ex-spouse merely because the custodial parent is in the Program. Although the extent of constitutional protection for an ex-spouse's visitation rights is unclear, it is probable that the absolute termination of all visitation or contact between ex-spouse and child, which necessarily occurs when a child enters the Program, would be subjected to constitutional scrutiny. *See Wise* v. *Bravo*, 666 F.2d at 1332 ("visitation rights . . . within the reach of Due Process . . . Clause"); *id.* at 1338 (Seymour, J., concurring) (same); *Ruffalo* v. *Civiletti*, 539 F. Supp. at 952 (termination of visitation rights to child in Witness Protection Program subject to constitutional scrutiny).[24] Moreover, while the Supreme Court has not articulated the permissible grounds for terminating a child's relationship with a parent, it has suggested that "the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the child's best interest.'" *Quilloin* v. *Walcott*, 434 U.S. at 255 (quoting *Smith* v. *Organization of Foster Families*, 431 U.S. 816, 862–63 (1977) (Stewart, J., concurring)).[25]

---

[23] Although we have not been asked what procedures should be followed when the witness and ex-spouse have been granted joint custody, as numerous state statutes permit, *see, e g.*, Cal. Civ Code, § 4600.5(a), the analysis of visitation rights should be generally applicable to this situation as well.

[24] *Cf. Leonhard* v *United States*, 633 F.2d at 618 (child in Program has constitutionally implicated interest in relationship with father outside the Program). *But cf. Leonhard* v. *Mitchell*, 473 F.2d at 713–14 (discussed above)

[25] *See also Santosky* v. *Kramer*, 455 U.S. at 760 n 10 (it is not "clear that the State constitutionally could terminate a parent's rights *without* showing parental unfitness") (emphasis in original). *Cf Stanley* v *Illinois*, 405 U.S. 645 (striking down under Due Process Clause the irrebuttable presumption that illegitimate father is unfit parent).

Because the termination of an ex-spouse's visitation rights may end, as a practical matter, any personal relationship or contact between the ex-spouse and the child for an extended period, if not forever, the question arises whether such a disruption may be accomplished constitutionally without a showing that the ex-spouse is somehow an unfit parent.

In the unique circumstance of the Witness Protection Program, the termination of the ex-spouse's visitation rights should not violate the constitutional rights of the ex-spouse. In *Quilloin* itself, the Supreme Court recognized that there were situations where a parent's rights could be terminated merely because it was in the best interests of the child. The Court upheld a state procedure permitting the adoption of an illegitimate child by a stepfather over the objections of the natural father when the state court found it was in the best interests of the child. The Court specifically relied on the fact that the traditional family unit in *Quilloin* had already been dissolved and the child was joining a family unit already in existence. Similarly, in a case arising under the Witness Protection Program, the original family unit normally will already have been dissolved, and the child will be living with one parent with custody. Even more importantly, the life of the participant and of the child could be placed in jeopardy if the spouse were able to exercise her visitation rights. The judgment that visitation could threaten the well-being of the child, moreover, will normally be shared by officials of the Marshals Service, the parent of the child, and, as discussed below, the state court overseeing the custody and visitation dispute. We do not believe that the constitutional protection for the ex-spouse's relationship with the child includes jeopardizing the physical well-being of the child or his custodial parent in these unusual circumstances. Largely for these reasons, two courts which have considered this question, *Leonhard* v. *Mitchell*, 473 F.2d at 714 and *Franz* v. *United States*, 526 F.Supp. 126 (D.D.C. 1981) have found the termination of an ex-spouse's visitation rights to a child in the Program is constitutional.[26]

Even though the termination of an ex-spouse's visitation rights is, in our view, constitutional under these unique circumstances, the procedural question remains whether the Marshals Service may ever admit a child into the Program if the participant has not *first* obtained a modification of any state court decision giving the ex-spouse visitation rights. Normally, "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Board of Regents* v. *Roth*, 408 U.S. 564, 570 n.7 (1972) (quoting *Boddie* v. *Connecticut*, 401 U.S. 371, 379 (1971)). Thus, an ex-spouse could argue that the Marshals Service should not admit a child into the Program until she has had an opportunity to litigate the issue of her visitation rights in a state court. As a practical matter, any

---

[26] In *Ruffalo* v *Civiletti*, 539 F. Supp. at 952, the District Court denied summary judgment for the government in a suit brought by a participant's ex-wife who was seeking damages for the loss of visitation rights to her child in the Program. The court noted, however, that there are situations where the government would be justified in terminating visitation rights. *See id.* Thus, it is possible that, even under its analysis, the government could prove at trial sufficient justification for its actions to withstand constitutional scrutiny.

litigation over the issue of visitation rights would probably resolve itself into a dispute over custody. Because no participant could bring a child into the Program and continue the ex-spouse's visitation rights, any decision by the state court to continue the ex-spouse's visitation rights would effectively require that the ex-spouse receive custody. The procedural due process question therefore becomes whether the ex-spouse has a right to litigate this issue before the participant enters the Program, or whether she must wait to litigate it through the special mechanisms we have outlined above.

Because of the unusual facts of this situation, resolution of this question should be left in the first instance to officials of the Marshals Service. As the Supreme Court has observed, due process "is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Cafeteria Workers* v. *McElroy*, 367 U.S. 886, 895 (1961). We suspect that in most instances, the participant's and child's life could be placed in jeopardy if an ex-spouse had a right to contest the extinction of her visitation rights before the child entered the Program. Such cases appear to be classic examples of "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Board of Regents* v. *Roth*, 408 U.S. at 570. *See also Duchesne* v. *Sugarman*, 566 F.2d at 826. On the other hand, there may be instances where there is an opportunity to litigate the issue in state court without endangering the participant's or the child's life. The Memorandum of Understanding (p. 5), for example, requires the witness to reach an agreement with all of his creditors before entering the Program, suggesting that there is also time, at least in the case of some participants, to litigate the visitation issue before the participant and child assume new identities. In such cases, the Marshals Service would appear to be obligated to allow the ex-spouse an opportunity to contest the extinction of her visitation rights in state court before the child enters the Program. Because we are not sufficiently familiar with the operation of the Program to assess these interests, we recommend that the Marshals Service determine the circumstances in which it believes it has a compelling interest in not providing the ex-spouse with an opportunity to obtain a modification of a visitation decree before the child enters the Program. We are, of course, available to evaluate the constitutionality of such standards or guidelines in light of the Marshals Service's analysis of the governmental interest.

## VI. Protection of Child's Constitutionally Protected Relationship with the Parental Ex-Spouse

The courts have suggested that a child in the Program has a constitutionally implicated interest in his relationship with the parental ex-spouse. *See Leonhard* v. *United States*, 633 F.2d at 618; *Franz* v. *United States*, 526 F.Supp. 126 (D.D.C. 1981). As in the case of the parental ex-spouse's interest, the child's interest has two aspects—his interest in being in the custody of a parent who has a legal right to custody; and his interest in being within reach of a parent with a right to visitation. Nevertheless, for much the same reasons that the proposed

procedures, along with our recommended changes, would satisfy the constitutional interests of the ex-spouse in her relationship with the child, they would also accommodate the child's protected interest in his relationship with the ex-spouse.[27]

With respect to the custody issue, the proposed procedures would assure that an ex-spouse could litigate the issue and obtain custody pursuant to a valid custody order. Accordingly, the child would not be deprived of his interest in being in the custody of a parent who wished to pursue her custody rights.

With respect to visitation, the child would be kept out of reach of visitation by an ex-spouse, but, as where the ex-spouse challenges this action, the government has a sufficiently compelling interest in refusing to disclose the participant's and child's new identity in these circumstances. This conclusion is based on three factors.

First, the Marshals Service has a compelling interest in protecting the minor child and participating parent from the consequences that could result if the ex-spouse were permitted to visit. Assuming that officials of the Marshals Service act in good faith in assessing this danger, their decision to refuse to disclose the new identity of the child in order not to jeopardize the child's safety would surely constitute a reasonable performance of their official responsibilities.

Second, under the procedures we have proposed, either a state court or the ex-spouse would have concurred in the judgment of the Marshals Service that the visitation rights must be extinguished. Under these procedures the Marshals Service would afford the witness an opportunity to challenge the termination in state court, and the Service would honor any decision of the state court continuing visitation rights.[28] Accordingly, a child's visitation rights would only be terminated when a state court had concurred in the decision of the parent and witness as to the need to terminate visitation rights in the best interests of the child. Otherwise, the ex-spouse would not have challenged the termination.

Finally, the parent with custody of the child would have concurred in the government's judgment as to the danger to the child. Parents speak for their children in a variety of different circumstances, and usually are presumed to represent their best interests. In a related context, for example, the Supreme Court upheld a state procedure whereby a parent or guardian was permitted to commit a child to a mental institution solely on the judgment of the parent and the hospital. *Parham* v. *J.R.*, 442 U.S. 584 (1979). The court reasoned as follows:

> [O]ur constitutional system long ago rejected any notion that a child is "the mere creation of the State," and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations." *Pierce* v. *Society of Sisters*, 268 U.S. 510, 535

---

[27] Only the interests of minor children are at issue. The admission of an older child into the Program would not create any constitutional problem for, like the witness, an older child would have a right, if he wished, to resume contact with the ex-spouse. *Leonhard* v. *United States*, 633 F.2d at 619

[28] As a practical matter, this would probably mean the voluntary return of the child to the ex-spouse in order to protect the witness.

(1925). . . . The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

*Id.* at 602. (Citations omitted; emphasis in original.) Similarly, in cases arising under the Witness Protection Program, a participant who has been granted custody would enjoy this presumption of concern for the welfare and best interests of his child.

The only courts to consider this issue, *Leonhard v. United States*, 633 F.2d at 618, and *Franz v. United States*, 526 F. Supp. at 127, have denied a child's challenge to the termination of visitation rights under the Program because the parent with custody had consented. While we question whether the custodial parent's consent alone would justify terminating the other parent's visitation rights, where officials of the Marshals Service and the state courts concur in that judgment, we do not believe that the children could successfully challenge the decision on constitutional grounds.

## VII. Constitutional Limitations on the Enforcement of Debts of Witnesses

A separate constitutional issue arises with respect to the proposed new policy for dealing with creditors of witnesses. Under this policy, the Marshals Service would evidently reveal the new identity of a witness to a creditor in certain egregious cases, but not in all cases. While we find no statutory or constitutional impediment to the disclosure of witnesses' identities in such cases, the failure to disclose witnesses' identities to all bona fide creditors raises a constitutional issue under the "takings clause" of the Fifth Amendment. This section provides that "private property [may not] be taken for public use, without just compensation."[29] If the Marshals Service's refusal to disclose the new identity of a witness in these circumstances constitutes a "taking" of the creditor's property within the meaning of the Fifth Amendment, the government would be required to compensate the creditor for his claim against a witness.

The Supreme Court has recognized that there is no "set formula" for determining when a government action constitutes a taking. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). Ordinarily, in reaching its decisions, the Court has engaged in "essentially ad hoc, factual inquiries," *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978), which "call[ ] as much for the exercise of judgment as for the application of logic."

---

[29] Contracts are property within the meaning of the Fifth Amendment. *See, e g , United States Trust Co. v New Jersey*, 431 U.S 1, 19 n.16 (1977), *Armstrong v. United States*, 364 U S. 40, 44–46 (1960), *Contributors to Pennsylvania Hospital v Philadelphia*, 245 U S 20 (1917).

*Andrus* v. *Allard,* 444 U.S. 51, 65 (1979). Such judgment has been informed, however, by the Court's weighing of four different factors.[30]

The first factor is "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations. . . ." *Penn Central,* 438 U.S. at 124. If a government action has deprived the claimant of the most reasonable use of his property, the Court is much more likely to find there has been a taking than if he is left with some reasonable economically viable use.[31]

The second factor is whether the claimant's investment-backed expectations can be said to be "reasonable." The government may prohibit certain "obnoxious" uses of property which would threaten "the health, safety, morals, or general welfare," *Nectow* v. *Cambridge,* 277 U.S. 183, 188 (1928); *see Euclid* v. *Ambler Realty Co.,* 272 U.S. 365, 388–89 (1926). Under such circumstances, the resulting economic loss to the owner is not considered compensable.[32] Similarly, certain areas of economic activity are heavily regulated by the government, so that it would be unreasonable for private citizens to expect that their property or contracts will not be subjected to future regulations. *See Allied Structural Steel Co.* v. *Spannaus,* 438 U.S. 234, 249 (1978); *Veix* v. *Sixth Ward Building and Loan Assoc.,* 310 U.S. 32, 37–38 (1940).

The third factor is the extent to which the adverse government action falls upon a broad class rather than upon a discrete group. Zoning laws that affect a cross section of property in a community, *see Agins* v. *City of Tiburon,* 447 U.S. 255, 262 (1980), rather than a discrete group, as in spot zoning, *see Penn Central,* 438 U.S. at 132, and government wartime regulations that necessarily demand sacrifices from a large portion of the population, *see United States* v. *Central Eureka Mining Co.,* 357 U.S. 155, 168 (1958), are less likely to be classified as takings. *See also Monongahela Navigation* v. *United States,* 148 U.S. 312, 325 (1893); Sax, *Takings and the Police Power,* 74 Yale L.J. 36, 75–76 (1964).

The final factor is the extent to which the government's action is directed at and impacts upon the defendant's property directly and physically, rather than indirectly. *See, e.g., Penn Central,* 438 U.S. at 124; *United States* v. *Central Eureka Mining Co.,* 357 U.S. at 165–66; *Omnia Commercial Co.* v. *United States,* 261 U.S. 502, 510 (1923). As the Supreme Court has recently held, "a permanent

---

[30] Two general principles should be borne in mind in examining any taking question. On the one hand, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every change in the general law" *Pennsylvania Coal Co.* v. *Mahon,* 260 U.S. 393, 413 (1922) On the other hand, at some point the taking clause "bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States,* 364 U S at 49. Any decision on taking ultimately "requires a weighing of private and public interests." *Agins* v. *City of Tiburon,* 447 U S. 255, 261 (1980) The factors discussed in the text have been cited by the Court when undertaking this balancing process.

[31] *Compare Penn Central,* 438 U S. at 136 (preservation of historical site "does not interfere with what must be regarded as . . the primary expectation concerning the use of the parcel") *with Pennsylvania Coal Co* v *Mahon,* 260 U.S. 393, 413 (1922) (where deprivation "reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act")

[32] *See also Heart of Atlanta Motel, Inc* v. *United States,* 379 U.S. 241, 261 (1964) (loss of business due to government antidiscrimination laws not compensable), *Everard's Breweries* v. *Day,* 265 U.S 545, 563 (1924) (loss of value of alcoholic beverage stock due to prohibition not compensable).

physical occupation of property" is a taking "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U.S. at 434–35.

Application of these factors to cases arising under the Witness Protection Program is obviously complicated. In most situations, we assume that the creditors would have a reasonable expectation to the payment of their claims, depending upon the ability of the debtor to pay, and.the destruction of any specific claim would obviously fall directly and probably exclusively on the claimant, thereby placing the cost of the government action upon a small discrete group rather than upon a cross section of the community. Moreover, in many cases, the Service's refusal to disclose the location of witnesses would result in the practical destruction of the creditors' entire claims, although there may be cases where the withholding of information would only be temporary, or where there is a mechanism by which a creditor could satisfy his claim against other property of the witness.

On the other hand, in virtually all of these cases, the government will not have *directly* deprived the creditor of his property, but rather only assisted a private person in changing his identity, thereby indirectly and unintentionally depriving the creditor of his property by making it impossible for the creditor to enforce his claim. As the Supreme Court has noted in finding the government was not responsible for the damage done by rioters reacting to the presence of government troops, "in any case where government action is causally related to private misconduct which leads to property damage[,] a determination must be made whether the government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment." *YMCA* v. *United States,* 395 U.S. 85, 93 (1969). In cases arising under the Witness Protection Program, the government normally will have made good faith efforts not to permit a witness to enter the Program with outstanding debts, will have disclosed the identity of witnesses to creditors in particularly egregious cases, and will not itself have received any use of the property for its own purposes.[33] All these considerations would support the argument that government's actions are not "sufficiently direct and substantial" to require it to pay compensation. Indeed, the only court that, to our knowledge, has considered the question whether the Marshals Service's concealment of a witness from a creditor constitutes a taking has found that it does not, for essentially these reasons. It held that "the governmental action [of concealing the debtor's identity] was not directed at or toward the plaintiff's property right, and any interference with that right, the evidence of which plaintiff still retains, is at most

---

[33] This situation can be contrasted with *Webb's Fabulous Pharmacies* v *Beckwith,* 449 U.S. 155, 163 (1980), where the court struck down a state system of interpleader funds because it was "a forced contribution to general governmental revenues" rather than an adjustment of the "benefits and burdens of economic life." *See generally* Sax, *Takings and the Police Power,* 74 Yale L J. 36 (1964)

an indirect consequence of the exercise of lawful government power." *Melo-Tone Vending* v. *United States,* 666 F.2d at 689.[34]

In light of the difficulty in determining whether any one of these factors would be dispositive in a particular factual circumstance, we cannot say with any certainty whether the courts would find the refusal to disclose a witness' identity to be a taking in any particular case. We note that the refusal of the Marshals Service to admit into the Program witnesses who it knows have large debts, and its willingness to disclose the identity of witnesses to creditors in particularly egregious cases, would certainly improve its legal position in those cases where it decides not to disclose a witness' identity to creditors. Therefore, we cannot say at the present time in the abstract that the courts would *not* uphold such a refusal in a particular case. If you would like us to examine this issue in greater detail in particular factual contexts, we would be happy to do so.[35]

## VIII. Witness' Statutorily Based Due Process Right

Finally, we note that the proposed procedure would satisfy any constitutionally protected interest the witness may have in the concealment of his identity. Although a witness' interest in preventing enforcement of claims does not invoke substantive constitutional protection, *see United States* v. *Kras,* 409 U.S. 434, 446 (1973),[36] the Supreme Court has recognized that a person may have a *statutorily* derived "legitimate claim of entitlement." *Board of Regents* v. *Roth,* 408 U.S. at 577. Such property or liberty interests

> are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

---

[34] We also note that there is a practical consideration in support of this view, the government often does not have sufficient information to litigate whether a creditor has a valid claim against a witness, and therefore against the government. The only person, other than the creditor, who has this information—the witness—has no incentive to assist the government if he knows that, by assisting the government, he may be held liable for his debt. Thus, any general policy of reimbursing claims against creditors could possibly lead to abuse because of the difficulty in establishing when a claimant has a valid case against the debtor, and therefore against the government

[35] For similar reasons, we do not believe it is wise to attempt to reach any definite conclusions whether the refusal to disclose the new identity of a witness would violate the Contract Clause. The Contract Clause provides that "[n]o State shall . pass any . Law impairing the Obligation of Contracts. ." U.S Const., Art 1, § 10. While on its face the clause applies only to state impairments of contractual obligations, the Supreme Court has suggested that the Fifth Amendment may impose similar restrictions on the federal government's impairment of contracts, *see, e g., Thorpe* v *Housing Authority,* 393 U.S 268, 278 n 31 (1969); *Perry* v *United States,* 294 U S 330, 353–54 (1935), although probably less stringent. *Cf. Usery* v. *Turner Elkhorn Mining Co* , 428 U.S. 1 (1976). As in the case of takings, however, there is a question whether the refusal to disclose the whereabouts of a debtor can be said to constitute an "impairment" of the contract with his creditors in the types of cases arising under the Program. In determining whether an impairment of a contract violates the Contract Clause, moreover, the Supreme Court has considered how severe the impairment is and whether it is "necessary to meet an important general social problem " *Allied Structural Steel Co* v *Spannaus,* 438 U.S. at 247 *See United States Trust Co.* v *New Jersey,* 431 U S. 1, 29 (1977). Because such a determination is dependent on the facts of each case and the actions of the Marshals Service in minimizing unnecessary impairments of creditors' claims, we do not believe any general conclusion about the operation of the Program can be made.

[36] There is also no substantive constitutional right to prevent the government from disclosing a witness' new identity to a creditor merely because it might assist a third person in locating the citizen and injuring him. *Cf Garcia* v. *United States,* 666 F.2d at 963 (no substantive constitutional right to protection of Program)

843

*Id*. When existing law creates such an entitlement, the government's decision to withdraw the benefit must be accomplished through procedures which satisfy the protections of the Due Process Clause.

In the case of a witness already receiving protection in the Program, the statute provides that he may continue to use the government facilities "for as long as the Attorney General determines the jeopardy to his life or person continues." Pub. L. No. 91–452, § 502, 84 Stat. 922, 933 (1970). The only court to address this question has found, however, that this provision does not limit the authority of the Attorney General, and therefore does not create a due process right. *Garcia* v. *United States*, 666 F.2d at 964. *Cf. Doe* v. *Civiletti*, 635 F.2d at 97 n.21 (no vested right to subsistence payments under the Act). As we discussed above, we agree with this decision.

Moreover, even if another court confronted with a more sympathetic fact situation than that presented in *Garcia*[37] found that a witness did have such a vested right, the proposed procedures would satisfy any procedural due process right. Under these procedures, a witness would be afforded physical protection in any judicial proceeding so that he could contest any suit brought by a creditor against him and would be provided with an attorney to assist him in his defense. If he should lose in that proceeding, but nevertheless refuse to satisfy the judgment, he should not be entitled to any *additional* procedures before the Marshals Service disclosed his identity. Therefore, even if a court were to find that a witness had a vested interest in his continued participation in the Program, providing the witness with a judicial forum and an attorney would discharge the government's due process obligations. *See generally Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).

## IX. Conclusion

Our conclusions can be summarized as follows.[38] First, the Crime Control Act authorizes the Attorney General to adopt the proposed procedures. Second, the proposed procedures would not subject the federal government to liability under either the Federal Tort Claims Act or the Tucker Act. Third, in certain rare circumstances, the proposed procedures could possibly violate the due process rights of an ex-spouse who is unable, without knowledge of the witness' new identity, to secure a binding custody or visitation rights determination against a witness participant. Thus, in our view, the Marshals Service should disclose the witness' identity to an ex-spouse in such disputes if (1) the witness refuses to waive objections to jurisdiction, thereby precluding his ex-spouse from obtaining a forum to litigate her claims, and (2) the Marshals Service would be able to provide a secure forum for him to litigate his position if he waived objections. For similar reasons, the procedures should be modified to require a witness to seek

---

[37] In *Garcia*, the participant had repeatedly and flagrantly violated the terms of his agreement with the Marshals Service.

[38] We have not considered the question of the child's inheritance rights or possible future claim to use the name of his natural parent, insofar as these issues are not presented by the proposed procedures.

amendment of state custody orders granting his ex-spouse visitation rights before the witness and child enter the Program if any resulting delay would not endanger the physical well-being of the child or the witness. If such a modification cannot be sought before entering the Program, appropriate efforts should be made as promptly thereafter to provide an opportunity for litigation in a secure environment provided by the Service.

Finally, the decision to disclose a witness' new identity to a creditor is permissible in the egregious cases which have been described. On the other hand, we cannot say at this point that a *refusal* to identify the witness to a creditor would violate the Fifth Amendment, although we caution that resolution of this question may be dependent on the facts of each case and the developing state of the law in this complex area. To improve our legal position in such cases, we recommend that the Service make every effort to assure that witnesses not be admitted into the Program with outstanding debts, and that a good faith effort be made to induce witnesses to pay legitimate claims in those cases where the Service concludes it is inappropriate to reveal their new identities.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*